49 Cal.Rptr.3d 227 (2006)
142 Cal.App.4th 1457
Linda McKELL et al., Plaintiffs and Appellants,
v.
WASHINGTON MUTUAL, INC. et al., Defendants and Respondents.
No. B176377.
Court of Appeal of California, Second District, Division One.
September 18, 2006.
*233 Lerach Coughlin Stoia Geller, Rudman & Robbins, John J. Stoia, Jr., Timothy G. Blood, Kevin K. Green, and Tami Falkenstein Hennick, San Diego, for Plaintiffs and Appellants.
Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Albert Norman Shelden, Senior Assistant Attorney General, Ronald A. Reiter, Michele R. Van Gelderen and Christina V. Tusan, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.
Stroock & Stroock & Lavan, Julia B. Strickland, Lisa M. Simonetti and JiAe *234 Moon, Los Angeles, for Defendants and Respondents.
SPENCER, P.J.

INTRODUCTION
Plaintiffs Linda McKell, Scott David Pasnikowski and Susan Nero appeal from an order of dismissal entered after the trial court sustained defendants' demurrer to their second amended complaint without leave to amend. Plaintiffs challenge the propriety of the trial court's ruling. We reverse the order of dismissal and direct the trial court to overrule defendants' demurrer as to certain of plaintiffs' causes of action.

FACTUAL AND PROCEDURAL BACKGROUND[1]
Plaintiffs brought this action for damages and equitable relief against defendants[2] as a class action. The trial court sustained defendants' demurrer and dismissed the action without ruling on the question whether the case could proceed as a class action.
In their first amended complaint, plaintiffs alleged causes of action for violation of the Unfair Competition Law (UCL, Bus. & Prof.Code, § 17200 et seq.); violation of the Consumers Legal Remedies Act (CLRA, Civ.Code, § 1750 et seq.); unjust enrichment/imposition of a constructive trust; breach of contract; breach of bailment agreement; and conversion. The basis of all causes of action was defendants' overcharging plaintiffs for underwriting, tax services, and wire transfer fees in conjunction with home loans. Defendants charged plaintiffs more for these services than defendants paid the service providers.
The trial court sustained defendants' demurrer with leave to amend. It explained that plaintiffs' causes of action "turn on the alleged existence of an agreement requiring Washington Mutual to charge no more than pass-through costs for underwriting, tax services, and wire transfers." Plaintiffs acknowledged at oral argument that they had "no express contractual statement requiring Washington Mutual to limit charges to pass-through costs," so they were relying "on an allegedly implied requirement." The court found the first amended complaint unclear as to how such a requirement could be implied from plaintiffs' dealings with Washington Mutual.
The trial court allowed plaintiffs to amend their complaint to allege with specificity "(1) why the agreement [to charge plaintiffs only pass-through costs] is implied, (2) how the agreement, as implied, is binding on Washington Mutual, and (3) why the agreement definitively requires Washington Mutual to charge pass-through costs." The court required plaintiffs to amend each cause of action to explain specifically how Washington Mutual's misconduct related to the agreement.
In their second amended complaint, plaintiffs alleged that they obtained "federally related mortgage loan[s] from Washington Mutual" to purchase their homes. As a condition of obtaining the loans, *235 Washington Mutual required them to pay the costs of automatic underwriting and wire transfers. It did so "by disclosing on the HUD-1 Settlement Statement the purported costs of these fees." The cost to Washington Mutual of underwriting and wire transfers "is substantially less than the amounts Washington Mutual represents on its HUD-1 Settlement Statement."
Additionally, Washington Mutual required plaintiffs to pay a tax services fee. The deeds of trust provided by Washington Mutual, prior to the close of escrow, stated: "Lender may require Borrower to pay a one time charge for a real estate tax verification and/or reporting service used by Lender in connection with this loan."
The Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) were created to expand opportunities for home ownership. They are mandated to increase the affordability of home ownership by reducing the cost of borrowing. According to Freddie Mac, for every $400 reduction in closing costs, another 70,000 families qualify to purchase a home.
In 1995, Fannie Mae and Freddie Mac began requiring lenders who sell loans to them to use automated underwriting software. This software quickly analyzes the borrower's ability to repay the loan and assigns an underwriting score. If the score indicates an acceptable risk, the underwriting process is complete, and Fannie Mae and Freddie Mac guarantee they will purchase the loan on the secondary market.
The automated underwriting software significantly decreases the cost and risk of underwriting to the lender as well as the time for closing a loan. Fannie Mae and Freddie Mac charge just $20 to underwrite a loan, and they can issue a purchase guarantee in 20 minutes. Freddie Mac estimates that the automated software should save $400 to $650 in closing costs. Loans close in five days rather than 30 to 60 days.
Rather than passing on the savings resulting from the automatic underwriting program, Washington Mutual charged borrowers hundreds of dollars for underwriting services which cost only $20. It charged plaintiff McKell $400, and plaintiffs Pasnikowski and Nero $250, for underwriting services. It did not disclose to borrowers that in many cases it was performing no underwriting services, it was charging them significantly more than the cost of those services and it was retaining the difference. "Washington Mutual intentionally concealed and continues to conceal these practices from borrowers by listing the inflated underwriting charge on the HUD-1 Settlement Statement while failing to disclose that this is not the actual cost incurred. Such a practice deceives consumers by leading them to reasonably conclude that the amount listed is the amount incurred."
Washington Mutual also requires borrowers to pay third party vendors to obtain information about property taxes on the property being purchased. Washington Mutual charges borrowers more for the third party vendor services than the vendors charge, without performing any additional services, and retains the difference, unbeknownst to the borrowers.
Similarly, Washington Mutual pays a flat fee to wire money to another bank or title company. It charges borrowers fees for this service well above its costs, without performing any additional services and without disclosing the markup to borrowers.
The foregoing practices, plaintiffs alleged, violated the UCL prohibition against unlawful business practices, in that *236 they defrauded and misled plaintiffs in violation of the Civil Code and common law; violated the California Residential Mortgage Lending Act (CRMLA, Fin.Code, § 50000 et seq.); violated the Real Estate Settlement Procedures Act (RESPA, 12 U.S.C. § 2601 et seq.) and Housing and Urban Development (HUD) regulations and policy statements interpreting RESPA; they violated Regulation X (24 C.F.R. § 3500.1 et seq.); violated CLRA; unjustly enriched defendants; constituted an unconscionable provision in violation of Civil Code section 1770, subdivision (a)(19); and violated 18 United States Code sections 1001 and 1010 prohibiting knowingly making a false statement on a HUD-1 Settlement Statement. The practices also violated the UCL prohibitions against unfair and fraudulent business practices, in that they were likely to deceive the public and did, in fact, defraud and mislead plaintiffs and frustrate the public policy behind the aforementioned state and federal laws and regulations.
In their breach of contract cause of action, plaintiffs alleged that "Washington Mutual requires its borrowers to pay the cost of automatic underwriting and wire transfers . . . by disclosing on the HUD-1 Settlement Statement the purported costs of these fees." Additionally, "[a]s a condition to obtaining a loan, pursuant to the deed of trust supplied by Washington Mutual, Washington Mutual also requires its borrowers to pay a tax services fee. The deed of trust states that the `Lender may require Borrower to pay a one time charge for a real estate tax verification and/or reporting service used by Lender in connection with this loan.'" Washington Mutual breached its contract "because instead of charging plaintiffs . . . for underwriting, tax services and wire transfer services, Washington Mutual charged plaintiffs . . . amounts in excess of those services."
Plaintiffs' breach of bailment agreement cause of action was based on Washington Mutual's wrongful use of fees plaintiffs paid it for underwriting, tax services and wire transfer services. Their cause of action for conversion was based upon Washington Mutual's overcharging for the services and refusing to return the money it overcharged plaintiffs.
Defendants again demurred. The trial court sustained the demurrer without leave to amend.
The court explained that plaintiffs' causes of action relied on an implied requirement that defendant charge them pass-through costs only. "Printing charges for underwriting services, etc. on HUD-1 statements, without more, does not create a requirement that Defendants charge pass-through costs. The HUD-1 statements reflect what Washington Mutual charges customers for settlement services and not (necessarily) what Washington Mutual pays for those services."
While the court did not address each individual cause of action, it noted that Washington Mutual's arguments as to these causes of action "appear[ed] meritorious." For example, RESPA applies when a lender charges fees for services it did not provide and splits the unearned amounts with third parties. Additionally, plaintiffs alleged no "affirmative misrepresentations, likelihoods of deception, or duties to disclose" sufficient to state a cause of action under CLRA or the UCL. Moreover, with no implied requirement to charge only pass-through costs, plaintiffs did not allege a breach of contract, breach of bailment agreement or conversion.

CONTENTIONS
Plaintiffs contend the trial court erred in requiring them to plead a contract as the foundation for all causes of action and to *237 plead their causes of action with heightened particularity. We need not determine whether the trial court erred, in that we will review the second amended complaint de novo to determine whether plaintiffs have stated a cause of action.
Plaintiffs further contend they have stated a cause of action for breach of the UCL, which is not dependent upon the existence of a contract. We agree that plaintiffs have stated a UCL cause of action based on fraudulent, unfair and unlawful business practices. This cause of action is not preempted by federal law.
Plaintiffs assert that they pled a cause of action under CLRA. They have not pled a cause of action under CLRA.
Plaintiffs aver they pled a cause of action for breach of contract. We agree that they pled a cause of action for breach of contract.
Finally, plaintiffs contend their common law causes of action also are sufficiently pled. We disagree; plaintiffs have failed to demonstrate that they have stated a cause of action for restitution/imposition of a constructive trust, breach of bailment agreement or conversion.

DISCUSSION

I

Pleading Requirements/Standard of Review
A demurrer tests the sufficiency of the plaintiff's complaint, i.e., whether it states facts sufficient to constitute a cause of action upon which relief may be based. (Code Civ. Proc., § 430.10, subd. (e); Friedland v. City of Long Beach (1998) 62 Cal.App.4th 835, 841-842, 73 Cal.Rptr.2d 427.) In determining whether the complaint states facts sufficient to constitute a cause of action, the trial court may consider all material facts pleaded in the complaint and those arising by reasonable implication therefrom; it may not consider contentions, deductions or conclusions of fact or law. (Moore v. Conliffe (1994) 7 Cal.4th 634, 638, 29 Cal.Rptr.2d 152, 871 P.2d 204; Montclair Parkowners Assn. v. City of Montclair (1999) 76 Cal.App.4th 784, 790, 90 Cal.Rptr.2d 598.) The court also may consider matters of which it may take judicial notice. (Code Civ. Proc., § 430.30, subd. (a); City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (1998) 68 Cal.App.4th 445, 459, 80 Cal.Rptr.2d 329.) The court should not sustain the demurrer without leave to amend if the complaint, liberally construed, can state a cause of action under any theory or if there is a reasonable possibility the defect can be cured by amendment. (Aubry v. Tri-City Hospital Dist. (1992) 2 Cal.4th 962, 967, 9 Cal.Rptr.2d 92, 831 P.2d 317; Jager v. County of Alameda (1992) 8 Cal. App.4th 294, 297, 10 Cal.Rptr.2d 293.)
On appeal, we review the trial court's sustaining of a demurrer without leave to amend de novo, exercising our independent judgment as to whether a cause of action has been stated as a matter of law and applying the abuse of discretion standard in reviewing the trial court's denial of leave to amend. (Williams v. Housing Authority of Los Angeles, supra, 121 Cal.App.4th at pp. 718-719, 17 Cal. Rptr.3d 374; Montclair Parkowners Assn. v. City of Montclair, supra, 76 Cal.App.4th at p. 790, 90 Cal.Rptr.2d 598.) Plaintiff bears the burden of proving the trial court erred in sustaining the demurrer or abused its discretion in denying leave to amend. (City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, 68 Cal.App.4th at p. 459, 80 Cal. Rptr.2d 329; Coutin v. Lucas (1990) 220 Cal.App.3d 1016, 1020, 270 Cal.Rptr. 93.)
*238 The rules of pleading require, with limited exceptions not applicable here, only general allegations of ultimate fact. (Quelimane Co. v. Stewart Title Guaranty Co. (1998) 19 Cal.4th 26, 47, 77 Cal.Rptr.2d 709, 960 P.2d 513; Lim v. The.TV Corp. Internat. (2002) 99 Cal.App.4th 684, 690, 121 Cal.Rptr.2d 333.) The plaintiff need not plead evidentiary facts supporting the allegation of ultimate fact. (Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 212, 197 Cal.Rptr. 783, 673 P.2d 660.) A pleading is adequate so long as it apprises the defendant of the factual basis for the plaintiff's claim. (Ibid.; Lim, supra, at p. 690, 121 Cal.Rptr.2d 333.)
The trial court here required plaintiffs to amend their complaint to allege with specificity "(1) why the agreement [to charge plaintiffs only pass-through costs] is implied, (2) how the agreement, as implied, is binding on Washington Mutual, and (3) why the agreement definitively requires Washington Mutual to charge pass-through costs." The court further required plaintiffs to amend each cause of action to explain specifically how Washington Mutual's misconduct related to the agreement.
We perceive no abuse of discretion in requiring plaintiffs to plead a factual basis for implying an agreement by Washington Mutual to charge only pass-through costs. To the extent the court may have required plaintiffs to plead additional evidentiary facts, its ruling would have been in error. (Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d at p. 212, 197 Cal.Rptr. 783, 673 P.2d 660; Lim v. The. TV Corp. Internat., supra, 99 Cal.App.4th at p. 690, 121 Cal.Rptr.2d 333.) We need not make the determination as to whether there was error, in that we review the second amended complaint de novo and make our own determination as to whether plaintiffs have pleaded facts sufficient to constitute a cause of action, under any theory. (Williams v. Housing Authority of Los Angeles, supra, 121 Cal. App.4th at pp. 718-719, 17 Cal.Rptr.3d 374; Montclair Parkowners Assn. v. City of Montclair, supra, 76 Cal.App.4th at p. 790, 90 Cal.Rptr.2d 598.)
As to the trial court's requirement that plaintiffs explain how each cause of action relates to the implied agreement, again, we need not determine whether there was error. We will make an independent determination as to whether plaintiffs pleaded an implied agreement and whether such agreement is required to plead a specific cause of action. (Williams v. Housing Authority of Los Angeles, supra, 121 Cal. App.4th at pp. 718-719, 17 Cal.Rptr.3d 374; Montclair Parkowners Assn. v. City of Montclair, supra, 76 Cal.App.4th at p. 790, 90 Cal.Rptr.2d 598.)

II

The UCL
The purpose of the UCL (Bus. & Prof.Code, § 17200 et seq.) "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. [Citation.]" (Kasky v. Nike, Inc. (2002) 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296, 45 P.3d 243.) It "defines `unfair competition' to mean and include `any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.)].' (§ 17200.)" (Kasky, supra, at p. 949, 119 Cal.Rptr.2d 296, 45 P.3d 243.)
The scope of the UCL is quite broad. (Kasky v. Nike, Inc., supra, 27 Cal.4th at p. 949, 119 Cal.Rptr.2d 296, 45 P.3d 243; Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. *239 (1999) 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527.) Because the statute is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition. (South Bay Chevrolet v. General Motors Acceptance Corp. (1999) 72 Cal.App.4th 861, 878, 85 Cal.Rptr.2d 301.)
A cause of action for unfair competition under the UCL may be established "`independent of any contractual relationship between the parties.'" (Acree v. General Motors Acceptance Corp. (2001) 92 Cal.App.4th 385, 396, 112 Cal.Rptr.2d 99; cf. Fletcher v. Security Pacific National Bank (1979) 23 Cal.3d 442, 449, 153 Cal.Rptr. 28, 591 P.2d 51.) Thus, the determination whether plaintiffs have stated a cause of action for violation of the UCL is not dependent upon their ability to plead the existence of an implied agreement to charge only pass-through costs for underwriting, tax services and wire transfer services.

Fraudulent Business Practices
Plaintiffs first contend they have alleged a UCL cause of action based on fraudulent business practices. A fraudulent business practice is one which is likely to deceive the public. (Massachusetts Mutual Life Ins. Co. v. Superior Court (2002) 97 Cal.App.4th 1282, 1290, 119 Cal.Rptr.2d 190; accord, Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 1267, 10 Cal.Rptr.2d 538, 833 P.2d 545.) It may be based on representations to the public which are untrue, and "`also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under'" the UCL. (Massachusetts Mutual Life Ins. Co., supra, at pp. 1289-1290, 119 Cal. Rptr.2d 190; Prata v. Superior Court (2001) 91 Cal.App.4th 1128, 1137, 111 Cal. Rptr.2d 296.) The determination as to whether a business practice is deceptive is based on the likely effect such practice would have on a reasonable consumer. (Lavie v. Procter & Gamble Co. (2003) 105 Cal.App.4th 496, 507, 129 Cal.Rptr.2d 486.)
In People v. Dollar Rent-A-Car Systems, Inc. (1989) 211 Cal.App.3d 119, 259 Cal.Rptr. 191, defendants prepared invoices for customers whose rental cars were damaged while in their possession, showing the "retail cost" for the repairs to the cars. Defendants paid a discounted price for parts and repairs, however. They did not inform the customers that they were charging them more than the actual cost of the repairs. "This practice left customers with the erroneous impression that defendants are passing on only the actual repair charges." (At p. 125, 259 Cal.Rptr. 191.) The court concluded that "[d]efendants' practice of charging its customers a higher `retail repair rate' without explanation or substantiation is a deceptive business practice which falls within the protection of [the UCL]." (Id. at p. 129, 259 Cal.Rptr. 191.) The customers would not reasonably understand that they were being charged a sum "considerably in excess of defendants' actual repair costs." (Id. at p. 130, 259 Cal.Rptr. 191.)
Plaintiffs alleged that on their HUD-1 Settlement Statements, Washington Mutual disclosed the purported costs of underwriting and wire transfers, and on their trust deeds, Washington Mutual stated that they might be required to pay a tax services fee. Looking at these documents, plaintiffs reasonably would conclude that the fees charged were the costs Washington Mutual incurred in providing these services. The fees charged were substantially above Washington Mutual's costs, *240 however. As in People v. Dollar Rent-A-Car Systems, Inc., supra, Washington Mutual's practice of charging its customers more for services than the actual cost of those services, with no indication to the customers that they were doing so, may constitute a deceptive business practice within the meaning of the UCL (211 Cal. App.3d at pp. 129-130, 259 Cal.Rptr. 191), as a reasonable consumer likely would believe that fees charged in connection with a home mortgage loan bore some correlation to services rendered.
Whether a practice is deceptive or fraudulent "cannot be mechanistically determined under the relatively rigid legal rules applicable to the sustaining or overruling of a demurrer." (Schnall v. Hertz Corp. (2000) 78 Cal.App.4th 1144, 1167, 93 Cal.Rptr.2d 439.) Rather, the determination is one question of fact, requiring consideration and weighing of evidence from both sides before it can be resolved. (Gregory v. Albertson's, Inc. (2002) 104 Cal.App.4th 845, 857, 128 Cal.Rptr.2d 389; Schnall, supra, at p. 1167, 93 Cal.Rptr.2d 439.) Plaintiffs' allegations, however, are sufficient to state a cause of action for fraudulent business practices under the UCL. (Schnall, supra, at p. 1170, 93 Cal. Rptr.2d 439.)
We reject Washington Mutual's claim that its business practices cannot be considered deceptive or fraudulent, in that federal law only requires that the HUD-1 statement itemize the charges imposed on the buyer and seller. (12 U.S.C. § 2603(a); 24 C.F.R. § 3500.8(b).) That the statement merely lists the charge imposed does not preclude a finding it is deceptive. (See Massachusetts Mutual Life Ins. Co. v. Superior Court, supra, 97 Cal.App.4th at pp. 1289-1290, 119 Cal. Rptr.2d 190; Prata v. Superior Court, supra, 91 Cal.App.4th at p. 1137, 111 Cal. Rptr.2d 296; see, e.g., People v. Dollar Rent-A-Car Systems, Inc., supra, 211 Cal. App.3d. at p. 129, 259 Cal.Rptr. 191.)

Unfair Business Practices
A business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits. (Schnall v. Hertz Corp., supra, 78 Cal.App.4th at p. 1166, 93 Cal.Rptr.2d 439; Saunders v. Superior Court (1994) 27 Cal.App.4th 832, 839, 33 Cal.Rptr.2d 438; but see Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th at pp. 184-187 and at p. 198, 83 Cal.Rptr.2d 548, 973 P.2d 527, dis. opn. of Kennard, J.) The determination whether a business practice is unfair "`"involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . . [Citations.]" [Citation.]'" (Wilner v. Sunset Life Ins. Co. (2000) 78 Cal.App.4th 952, 965, 93 Cal. Rptr.2d 413.)
As with the determination whether a practice is fraudulent, the determination whether it is unfair is one of fact which requires a review of the evidence from both parties. (Schnall v. Hertz Corp., supra, 78 Cal.App.4th at p. 1167, 93 Cal.Rptr.2d 439.) It thus cannot usually be made on demurrer. (Ibid.; Saunders v. Superior Court, supra, 27 Cal.App.4th at p. 841, 33 Cal.Rptr.2d 438.)
Here, plaintiffs alleged a violation of public policy resulting in harm to consumers. Specifically, they alleged a violation of the federal public policy of expanding opportunities for home ownership by *241 reducing the cost of borrowing, in part through the use of automated underwriting software. They alleged harm to consumers through Washington Mutual's failure to pass on to borrowers the savings resulting from the use of automated underwriting software. Similarly, they alleged a violation of public policy and harm to consumers through overcharging for wire transfers and tax services.
Washington Mutual's response is twofold. First, it claims that, under the doctrine of judicial abstention, the court should not get involved in setting prices for services.
Courts in California "have long applied an abstention doctrine in cases involving matters of complex economic policy." (Desert Healthcare Dist. v. PacifiCare FHP, Inc. (2001) 94 Cal.App.4th 781, 794, 114 Cal.Rptr.2d 623.) This doctrine has been extended into the UCL arena, particularly where federal regulations also are involved. (Id. at pp. 794-795, 114 Cal. Rptr.2d 623; see, e.g., Wolfe v. State Farm Fire & Casualty Ins. Co. (1996) 46 Cal. App.4th 554, 53 Cal.Rptr.2d 878; California Grocers Assn. v. Bank of America (1994) 22 Cal.App.4th 205, 27 Cal.Rptr.2d 396; Korens v. R.W. Zukin Corp. (1989) 212 Cal.App.3d 1054, 261 Cal.Rptr. 137.) "Where a UCL action would drag a court of equity into an area of complex economic policy, equitable abstention is appropriate. In such cases, it is primarily a legislative and not a judicial function to determine the best economic policy." (Desert Healthcare Dist., supra, at p. 795, 114 Cal.Rptr.2d 623.)
While we appreciate the wisdom of abstention in matters calling for a legislative determination of economic policy, we do not believe abstention is required in the instant case. As set forth more fully below, the legislative determination as to the propriety of Washington Mutual's actions already has been made through the enactment of the applicable laws. Thus, by addressing plaintiffs' UCL claims, we are doing no more than enforcing already-established economic policies.
Second, Washington Mutual claims that, since its lending practices are strictly regulated, the court should not interfere in the matter by determining that its practices are unfair. The UCL "is not, and never was intended to be, a mechanism for challenging the price of goods and services as simply `too high.'"
In support of this second claim, Washington Mutual cites Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th at page 183, 83 Cal.Rptr.2d 548, 973 P.2d 527. Cel-Tech simply holds that a plaintiff may not bring an action under the UCL challenging business practices specifically permitted by other statutes. (Id. at pp. 183-184, 83 Cal.Rptr.2d 548, 973 P.2d 527.) Washington Mutual cites no statutes specifically permitting its challenged practices.
Moreover, the gravamen of plaintiffs' complaint is not that Washington Mutual's fees are too high. It is that Washington Mutual leads borrowers to believe it is charging them for the cost of certain services it provides, when in reality it is charging them substantially in excess of such costs. Therefore, plaintiffs have alleged unfair business practices within the meaning of the UCL.

Unlawful Business Practices
Unlawful business acts or practices within the meaning of the UCL include "`"`anything that can properly be called a business practice and that at the same time is forbidden by law.'"'" (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th at p. 180, 83 Cal.Rptr.2d 548, 973 P.2d *242 527.) A practice is forbidden by law if it violates any law, civil or criminal, statutory or judicially made (Saunders v. Superior Court (1994) 27 Cal.App.4th 832, 838-839, 33 Cal.Rptr.2d 438), federal, state or local (Smith v. State Farm Mutual Automobile Ins. Co. (2001) 93 Cal.App.4th 700, 718, 113 Cal.Rptr.2d 399).
By extending to business acts or practices which are "unlawful," "the UCL permits violations of other laws to be treated as unfair competition that is independently actionable. [Citation.]" (Kasky v. Nike, Inc., supra, 27 Cal.4th at p. 949, 119 Cal.Rptr.2d 296, 45 P.3d 243; Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th at p. 180, 83 Cal.Rptr.2d 548, 973 P.2d 527.) Even if the violation of another law does not create a private right of action, if the violation constitutes unfair competition, it is actionable. (Kasky, supra, at p. 950, 119 Cal.Rptr.2d 296, 45 P.3d 243.)
As stated above, plaintiffs alleged that Washington Mutual's practices violated numerous laws, including both California lawCRMLA (Fin.Code, § 50000 et seq.), CLRA (Civ.Code, § 1750 et seq.), Civil Code section 1770, subdivision (a)(19)and federal lawRESPA (12 U.S.C. § 2607), HUD regulations and policy statements interpreting RESPA, Regulation X (24 C.F.R. § 3500.1 et seq.), 18 United States Code sections 1001 and 1010. We focus on RESPA, as have the parties and the Attorney General.[3]
Congress enacted RESPA in 1974 "in order to reduce the costs consumers pay to settle their real estate transactions." (Sosa v. Chase Manhattan Mortg. Corp. (11th Cir.2003) 348 F.3d 979, 981.) Congress found "that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country. . . ." (12 U.S.C. § 2601(a).) Through RESPA, Congress sought "to effect certain changes in the settlement process for residential real estate that will result [¶] (1) in more effective advance disclosure to home buyers and sellers of settlement costs; [and] [¶] (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services. . . ." (Id., § 2601(b).)
RESPA requires that lenders use a uniform settlement statement form known as the HUD-1 form. (12 U.S.C. § 2603; 24 C.F.R. § 3500.8 (2005).) The HUD-1 form must "conspicuously and clearly itemize all charges imposed on the borrower . . . in connection with the settlement. . . ." (12 U.S.C. § 2603(a).)
RESPA also prohibits kickbacks and unearned fees. (Sosa v. Chase Manhattan Mortg. Corp., supra, 348 F.3d at p. 981.) Section 8(b) of RESPA (hereinafter section 8(b), 12 U.S.C. § 2607(b)) specifically provides: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan *243 other than for services actually performed."[4]
With respect to the question whether section 8(b) prohibits charging more than pass-through costs, federal courts have focused on the word "and," attempting to determine whether a single person can violate the section, or whether both a giver and an acceptor are required for a violation. Kruse v. Wells Fargo Home Mortg., Inc. (2d Cir.2004) 383 F.3d 49 noted that "[t]he Fourth, Seventh, and Eighth Circuits have held that the text of section 8(b) clearly and unambiguously does not prohibit mark-ups," i.e., charging "plaintiffs for settlement services provided by third-party vendors in excess of the fees that the third-party vendors charged to the defendants for those services, `[w]ithout performing any additional services.'" (Kruse, supra, at p. 57.) Courts in those circuits reasoned "that the word `and' in section 8(b)'s phrase `no person shall give and no person shall accept' requires that there be both one or more persons who give and one or more persons who receive a settlement services fee other than for services actually performed for there to be a violation of the statute." (Ibid.; see Haug v. Bank of America, N.A. (8th Cir.2003) 317 F.3d 832, 836; Krzalic v. Republic Title Co. (7th Cir.2002) 314 F.3d 875, cert. den. (2003) 539 U.S. 958, 123 S.Ct. 2641, 156 L.Ed.2d 656; Boulware v. Crossland Mortg. Corp. (4th Cir.2002) 291 F.3d 261, 266.)
However, the Eleventh Circuit in Sosa v. Chase Manhattan Mortg. Corp., supra, 348 F.3d 979 concluded that "`[t]he "and" in subsection 8(b) . . . operates to create two separate prohibitions. . . . Giving a portion of a charge is prohibited regardless of whether there is a culpable acceptor, and accepting a portion of a charge is prohibited regardless of whether there is a culpable giver.'" (Kruse v. Wells Fargo Home Mortg., Inc., supra, 383 F.3d at p. 58, quoting from Sosa, supra, at p. 982.) Thus, "if the lender pays a third party for services and, though performing no additional services itself, charges an additional amount to the borrower, it receives that additional amount `other than for services actually performed,' in violation of the statute." (Kruse, supra, at p. 58, citing Sosa, supra, at pp. 982-983.)
The Kruse court found nothing in the language of section 8(b) to compel a conclusion as to the correct interpretation of the section. It thus proceeded to a determination whether to give deference to HUD's policy statement on the question. (Kruse v. Wells Fargo Home Mortg., Inc., supra, 383 F.3d at p. 58.) That policy statement, set forth in Regulation X, reads: "`A settlement service provider may not levy an additional charge upon a borrower for another settlement service provider's services without providing additional services that are bona fide and justify the increased charge. Accordingly, a settlement service provider may not mark-up the cost of another provider's services without providing additional settlement services; such payment must be for services that are actual, necessary and distinct services provided to justify the charge. 24 CFR [§] 3500.14(g)(3). The HUD regulation implementing Section 8(b) states: "[a] charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this Section." 24 CFR 3500.14(c).' [¶] Policy Statement, 66 Fed.Reg. at 53,059 ([italics] added; alteration in the original; footnote omitted)." *244 (Kruse, supra, at p. 58, fn. 7.)[5]
Under federal law, deference to an administrative agency's interpretation of a statute is mandatory under certain circumstances. (Kruse v. Wells Fargo Home Mortg., Inc., supra, 383 F.3d at p. 55, citing Chevron, U.S.A v. Natural Res. Def. Council, Inc. (1984) 467 U.S. 837, 843-844, 104 S.Ct. 2778, 81 L.Ed.2d 694.) Deference is said to be mandatory "`when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" (Kruse, supra, at p. 58, quoting from United States v. Mead Corp. (2001) 533 U.S. 218, 226-227, 121 S.Ct. 2164, 150 L.Ed.2d 292; see also Nat'l Cable & Telecomm. v. Brand X (2005) 545 U.S. 967, ___, 125 S.Ct. 2688, ___, 162 L.Ed.2d 820, 837-838.) It appeared to the Kruse court that Congress had delegated authority to HUD generally to make rules carrying the force of law,[6] and that the HUD policy statement was promulgated in the exercise of that authority.[7] (Kruse v. *245 Wells Fargo Home Mortg., Inc., supra, 383 F.3d at p. 59.)
Deference also may be mandatory "`depending upon to what extent the underlying statute suffers from exposed gaps in policies, especially if the statute itself is very complex, as well as on the agency's expertise in making such policy decisions, the importance of the agency's decisions to the administration of the statute, and the degree of consideration the agency has given the relevant issues over time.'" (Kruse v. Wells Fargo Home Mortg., Inc., supra, 383 F.3d at p. 59.) The Kruse court reviewed the history of HUD's interpretations of RESPA, concluding "the fact that the Policy Statement was apparently the culmination of HUD's reflections on the meaning of section 8(b) as applied to mark-ups over a period of years is further reason to defer to it." (Kruse, supra, at pp. 60-61.) Additionally, HUD has expertise in making policy decisions regarding federally related home mortgage loans, justifying deference to such decisions. (Id. at p. 61.)[8]
After weighing the relevant factors, the Kruse court concluded that mandatory deference must be accorded to HUD's interpretation of section 8(b) with respect to mark-ups. (Kruse v. Wells Fargo Home Mortg., Inc., supra, 383 F.3d at p. 61.) Thus, in accordance with HUD's policy statement, section 8(b) prohibits a "`settlement service provider' from `mark[ing]-up the cost of another provider's services without providing additional settlement services.'" (Kruse, supra, at pp. 61-62.)
We are, of course, not bound by decisions of the lower federal courts, even on questions of federal law. (McLaughlin v. Walnut Properties, Inc. (2004) 119 Cal. App.4th 293, 297, 14 Cal.Rptr.3d 369; Black v. Department of Mental Health (2000) 83 Cal.App.4th 739, 747, 100 Cal. Rptr.2d 39.) We find Kruse persuasive, however, and adopt that court's reasoning as our own.
As the Kruse court noted, section 8(b) does not state clearly and unambiguously that it applies only when there are both a giver and an acceptor of "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." Absent clear and unambiguous language in a statute, we interpret a statute in a manner consistent with the language therein and with legislative intent. (People v. Gardeley (1996) 14 Cal.4th 605, 621, 59 Cal.Rptr.2d 356, 927 P.2d 713; Moyer v. Workmen's Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230, 110 Cal.Rptr. 144, 514 P.2d 1224.) We accord great weight to the contemporaneous administrative interpretation given to a statute unless that interpretation is palpably erroneous. (Sharon S. v. Superior Court (2003) 31 Cal.4th 417, 436, 2 Cal.Rptr.3d 699, 73 P.3d 554; Stolman v. City of Los Angeles (2003) 114 Cal.App.4th 916, 928, 8 Cal.Rptr.3d 178.) Where the administrative agency interpreting the statute "has special expertise and its decision is carefully considered by senior agency officials, that decision is entitled to correspondingly greater weight." (Sharon S., supra, at p. 436, 2 Cal.Rptr.3d 699, 73 P.3d 554; Pacific Legal Foundation v. Unemployment *246 Ins. Appeals Bd. (1981) 29 Cal.3d 101, 111, 172 Cal.Rptr. 194, 624 P.2d 244.)
HUD's interpretation of section 8(b) is not palpably erroneous. First, the language of the section is reasonably susceptible (People v. Smith (2004) 32 Cal.4th 792, 797-798, 11 Cal.Rptr.3d 290, 86 P.3d 348; R.P. Richards, Inc. v. Chartered Construction Corp. (2000) 83 Cal.App.4th 146, 156, 99 Cal.Rptr.2d 425) of the interpretation given it by HUD. As noted in the 2001 HUD policy statement, section 8(b) is written in the disjunctive to the extent it prohibits giving or accepting "any portion, split, or percentage of any charge" for real estate settlement services "other than for services actually performed." It thus applies to more than just a split of unearned fees between two or more persons. (66 Fed.Reg. at pp. 53058-53059.) Moreover, had Congress intended that section 8(b) apply only when two or more persons were involved, it could have clearly specified so. (Murillo v. Fleetwood Enterprises, Inc. (1998) 17 Cal.4th 985, 999, 73 Cal.Rptr.2d 682, 953 P.2d 858; People v. Connor (2004) 115 Cal.App.4th 669, 685, 9 Cal.Rptr.3d 521.)
Additionally, as HUD points out, its interpretation of section 8(b) is consistent with Congress's stated intent to protect consumers from unnecessarily high settlement charges. (66 Fed.Reg. at pp. 53053, 53057, 53058.) Allowing a single settlement service provider to charge unearned fees would be "contrary to the Congressional finding when enacting RESPA that consumers need protection from unnecessarily high settlement charges." (Ibid.) As previously stated, the goal in interpretation of a statute is to interpret it in a manner consistent with legislative intent. (People v. Gardeley, supra, 14 Cal.4th at p. 621, 59 Cal.Rptr.2d 356, 927 P.2d 713; Moyer v. Workmen's Comp. Appeals Bd., supra, 10 Cal.3d at p. 230, 110 Cal.Rptr. 144, 514 P.2d 1224.)
Washington Mutual's position is that section 8(b) is unambiguous and requires both a giver and a receiver of the fee for settlement services. As stated above, we reject that position. Washington Mutual also claims that plaintiffs' state law causes of action have been preempted by federal law, and the trial court properly sustained its demurrer without leave to amend on that basis.
Congress has the power under the supremacy clause of the United States Constitution to preempt state law as to matters over which it has authority. (U.S. Const., art. VI, cl. 2; Bronco Wine Co. v. Jolly (2004) 33 Cal.4th 943, 955, 17 Cal. Rptr.3d 180, 95 P.3d 422.) Whether state law is preempted by federal law is a question of congressional intent. (Bronco Wine Co., supra, at p. 955, 17 Cal.Rptr.3d 180, 95 P.3d 422.) Intent to preempt may be express or implied. (Ibid.) It is express when Congress explicitly states that it is preempting state law. (Ibid.) It will be implied "(i) when it is clear that Congress intended, by comprehensive legislation, to occupy the entire field of regulation, leaving no room for the states to supplement federal law [citation]; (ii) when compliance with both federal and state regulations is an impossibility [citation]; or (iii) when state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citations.]" (Ibid.)
In areas traditionally regulated by the states, we start with the presumption that preemption was not intended. Preemption will not be found "`"unless that was the clear and manifest purpose of Congress."'" (Bronco Wine Co. v. Jolly, supra, 33 Cal.4th at p. 957, 17 Cal.Rptr.3d 180, 95 P.3d 422, italics *247 omitted; accord, Medtronic, Inc. v. Lohr (1996) 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700.) The party claiming a state law is preempted by federal legislation has the burden of demonstrating preemption. (Bronco Wine Co., supra, at pp. 956-957, 17 Cal.Rptr.3d 180, 95 P.3d 422.)
Even where an intent to preempt state law is found, we must determine the scope of that preemption. (Medtronic, Inc. v. Lohr, supra, 518 U.S. at pp. 484-485, 116 S.Ct. 2240.) In doing so, we are again guided by the intent of Congress. (Id. at pp. 485-486, 116 S.Ct. 2240.)
This brings us to Washington Mutual Bank v. Superior Court (1999) 75 Cal. App.4th 773, 89 Cal.Rptr.2d 560, decided by Division Five of this District. The case involved a petition for writ of mandate in Brown v. Washington Mutual Bank (Super. Ct. L.A. County, No. BC192874), the case in which HUD submitted a letter stating its longstanding position that "`where lenders or others charge consumers marked-up prices for services performed by the third party providers without performing additional services, such charges constitute "splits of fees" or "unearned fees" in violation of Section 8(b) of RESPA.'" (66 Fed. Reg. at p. 53058.)
The Brown case involved allegations similar to those in the instant case. Washington Mutual demurred, in part based on the doctrine of preemption. The trial court rejected the claim of preemption and overruled the demurrer. Washington Mutual filed a petition for writ of mandate to review that ruling. (Washington Mutual v. Superior Court, supra, 75 Cal.App.4th at pp. 775-777, 89 Cal.Rptr.2d 560.)
The appellate court noted that both RESPA and Regulation X contain preemption clauses. Both clauses provide that RESPA does not preempt state law except to the extent it is inconsistent with federal law. (Washington Mutual v. Superior Court, supra, 75 Cal.App.4th at pp. 780-781, 89 Cal.Rptr.2d 560.)[9] Thus, the doctrine of express preemption applies. (Id. at p. 781, 89 Cal.Rptr.2d 560.)
The court pointed out that "[w]hen Congress has expressly defined the extent to which state law is preempted, a court will interpret the effect of the preemption language by focusing on the plain wording of the provision [citation], but will narrowly construe the precise language of the preemption clause in light of the strong presumption against preemption." (Washington Mutual v. Superior Court, supra, 75 *248 Cal.App.4th at p. 782, 89 Cal.Rptr.2d 560.) Where federal law expressly preempts state law only to the extent it is "inconsistent" with the federal law, the preemption provision will be narrowly construed. (Id. at pp. 783-784, 89 Cal.Rptr.2d 560.) State law will be preempted only to the extent compliance with state law precludes compliance with federal law. (Ibid.)
The court noted that "[t]his narrow interpretation of the term `inconsistent' for purposes of express preemption is also reflected in the position taken by the Secretary in an informal opinion on the meaning of the term `inconsistent' as used in RESPA. In Informal Opinion No. 75 of the Department of Housing and Urban Development, issued on January 29, 1981, the Secretary takes the position that, `There is no inconsistency between RESPA and state law . . . unless compliance with one statute would result in violation of the other.' Informal Opinion No. 75 states that, `[A] party, having a duty under RESPA, must be in violation of the state statute if the party complies with RESPA and vice versa before a finding of inconsistency can be made.' . . ." (Washington Mutual v. Superior Court, supra, 75 Cal. App.4th at p. 784, 89 Cal.Rptr.2d 560, fn. omitted.)
The court went on to observe that the language in RESPA and Regulation X providing that state law shall not be deemed inconsistent with federal law if it provides more protection to consumers makes it "clear that Congress intended that consumers should receive maximum protection not only in the form of federal legislation but also in the form of state laws. Congress did not intend any preemption of state laws to occur if those laws resulted in more protections for the consumer as long as the state law did not interfere with the operation of the federal law and it was possible to comply with both the state and federal laws." (Washington Mutual v. Superior Court, supra, 75 Cal.App.4th at p. 785, 89 Cal.Rptr.2d 560.)
Based on its analysis, the court held that RESPA and Regulation X do not expressly preempt state law causes of action for violation of their provisions. (Washington Mutual v. Superior Court, supra, 75 Cal. App.4th at p. 787, 89 Cal.Rptr.2d 560.) The trial court thus properly allowed the action to proceed on the UCL and other state law causes of action. (Ibid.)
Washington Mutual does not cite Washington Mutual v. Superior Court, supra, 75 Cal.App.4th 773, 89 Cal.Rptr.2d 560 or the preemption provisions of RESPA and Regulation X in its discussion of preemption. It now claims that plaintiffs' causes of action are preempted by the Home Owners' Loan Act (HOLA, 12 U.S.C. § 1461 et seq.).
Congress enacted HOLA in 1933 to regulate the lending practices of federal savings and loan associations. (Fidelity Federal Sav. & Loan Assn. v. De La Cuesta (1982) 458 U.S. 141, 159, 161, 102 S.Ct. 3014, 73 L.Ed.2d 664.) It created the Federal Home Loan Bank Board (Bank Board) to administer HOLA (id. at p. 144 and fn. 1, 102 S.Ct. 3014), and it gave the Bank Board broad authority to regulate federal savings and loan associations (Conference of Federal Sav. & Loan Ass'ns v. Stein (9th Cir.1979) 604 F.2d 1256, 1257-1258; Glendale Fed. Sav. & Loan Ass'n v. Fox (C.D.Cal.1978) 459 F.Supp. 903, 910). In 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act, which abolished the Bank Board and replaced it with the Office of Thrift Supervision (OTS). (Security Savings and Loan v. Director, OTS (5th Cir. 1992) 960 F.2d 1318, 1320-1321.)
OTS issued a regulation addressing preemption of state laws by HOLA. Section *249 560.2 of 12 Code of Federal Regulations (2005) (section 560.2) provides: "(a) Occupation of field. Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110 of this part. For purposes of this section, `state law' includes any state statute, regulation, ruling, order or judicial decision." (Italics omitted.)
Paragraph (b) of section 560.2 provides "[i]llustrative examples" of "the types of state laws preempted by paragraph (a)." (Italics omitted.) These include "state laws purporting to impose requirements regarding" licensing, private mortgage insurance, loan-to-value ratios, credit terms, loan-related fees, escrow and impound accounts, disclosures in credit application forms, interest rate ceilings, and due-on-sale clauses. Paragraph (c) of section 560.2 lists the types of state laws that "are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section." These include contract, commercial, real property, tort and criminal law.
In analyzing whether, under section 560.2, plaintiffs' causes of action are preempted by HOLA, we begin by observing that banking is an area traditionally regulated by the states. (Peatros v. Bank of America (2000) 22 Cal.4th 147, 159, 91 Cal.Rptr.2d 659, 990 P.2d 539.) Bank regulation is an area which has been subject to "`dual' `federal-state' `control.'" (Ibid.) We thus must focus on whether the particular state statute at issue is preempted by the applicable federal law. (Id. at p. 167, 91 Cal.Rptr.2d 659, 990 P.2d 539.)
In Lopez v. World Savings & Loan Assn. (2003) 105 Cal.App.4th 729, 130 Cal. Rptr.2d 42, review denied May 14, 2003, plaintiff brought a UCL action alleging a violation of Civil Code section 2943, subdivision (e)(6). The statute at that time provided that the beneficiary of a mortgage or deed of trust could collect a fee of $60 for furnishing a statement of obligation in connection with a secured transaction. (Lopez, supra, at p. 732, 130 Cal. Rptr.2d 42.) Defendant charged the $60 fee plus an additional $10 or $20 fax fee. (Id. at pp. 732-733, 130 Cal.Rptr.2d 42.) Plaintiff claimed this additional fee violated Civil Code section 2943, subdivision (e)(6), and thus the UCL. Defendant claimed that HOLA preempted state law as to the propriety of the fax fees. The trial court agreed and granted judgment on the pleadings, finding that section 560.2 preempted state law as to loan-related *250 fees. (Lopez, supra, at p. 733, 130 Cal. Rptr.2d 42.)
The appellate court found it clear that section 560.2 was "intended to preempt all state laws purporting to regulate any aspect of the lending operations of a federally chartered savings association." (Lopez v. World Savings & Loan Assn., supra, 105 Cal.App.4th at pp. 737-738, 130 Cal. Rptr.2d 42.) The fee for furnishing a statement of obligation is part of the lending operations of a savings association. (Id. at pp. 738-739, 130 Cal.Rptr.2d 42.) The court thus held that section 560.2 preempted plaintiff's cause of action under Civil Code section 2943 and the UCL. (Lopez, supra, at p. 742, 130 Cal.Rptr.2d 42.)[10]
The court did note that the "UCL remains available to remedy a myriad of potential unfair, unlawful and fraudulent practices engaged in by federally chartered savings and loan associations, so long as the practice is outside the scope of federal regulation." (Lopez v. World Savings & Loan Assn., supra, 105 Cal.App.4th at pp. 741-742, 130 Cal.Rptr.2d 42.) To underscore the distinction between those practices which can be remedied by the UCL and those which cannot, the court cited two recent cases addressing the issue. (Id. at p. 742, 130 Cal.Rptr.2d 42.)
Lopez v. Washington Mut. Bank, FA (9th Cir.2002) 302 F.3d 900 "held that Code of Civil Procedure section 704.080, which exempts Social Security and SSI benefits from any enforcement action, has been preempted by 12 C.F.R. part 557.11 (2002), a deposit-related regulation closely comparable to 12 C.F.R. part 560.2. Because the state statute imposes requirements governing checking accounts, it is preempted by the OTS regulation which `hereby occupies the entire field of federal savings associations' deposit-related regulations.' (Lopez, 302 F.3d at p. 907.)" (Lopez v. World Savings & Loan Assn., supra, 105 Cal.App.4th at p. 742, 130 Cal. Rptr.2d 42.)
The court contrasted the foregoing case with Gibson v. World Savings & Loan Assn. (2002) 103 Cal.App.4th 1291, 128 Cal. Rptr.2d 19, which held that section 560.2 did not preempt a UCL action alleging the defendant charged borrowers more for replacement hazard insurance than was authorized by their trust deeds. The Lopez court agreed with Gibson that "`the duties of a contracting party to comply with its contractual obligations and to act reasonably to mitigate its damages in the event of a breach by the other party, . . . not to misrepresent material facts, and . . . to refrain from unfair or deceptive business practices' (Gibson, at p. 1301, 128 Cal. Rptr.2d 19), upon which the claims in that case were based, `are not requirements or prohibitions of the sort that [section] 560.2 preempts' (id. at p. 1302, 128 Cal.Rptr.2d 19)." (Lopez v. World Savings & Loan Assn., supra, 105 Cal.App.4th at p. 742, 130 Cal.Rptr.2d 42.) The court added that since the duties on which the UCL cause of action was based were general and not specifically directed toward federal savings associations in an attempt to regulate them, "`[a]ny effect they have on the lending activities of a federal savings association is incidental rather than material.'" (Ibid.)
Here, plaintiffs are not attempting to employ the UCL to enforce a state law *251 purporting to regulate the lending activities of a federal savings association, as was the case in Lopez v. Washington Mut. Bank, FA, supra, 302 F.3d 900. (Lopez v. World Savings & Loan Assn., supra, 105 Cal.App.4th at p. 742, 130 Cal.Rptr.2d 42.) Rather, they are using it to enforce federal law governing the operation of federal savings associations. Cases addressing other federal preemption statutes suggest that use of the UCL is not preempted under these circumstances. As noted in Washington Mutual Bank v. Superior Court, supra, 75 Cal.App.4th at page 787, 89 Cal. Rptr.2d 560 [holding that a UCL cause of action is not preempted by RESPA and Regulation X], "private state causes of action are not inconsistent with the federal disclosure requirements, but rather are complementary to the federal requirements and in fact will promote full compliance with the disclosure law enacted by Congress. We do not believe that allowing borrowers to sue for unlawful disclosures or omissions will interfere in any way with the operation of the federal law, and we find no conflict between RESPA and private state law causes of action."
The Medical Device Amendments of 1976(MDA) prohibit states from imposing on a medical device "any requirement . . . which is different from, or in addition to, any requirement applicable under this chapter to the device, and . . . which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." (21 U.S.C. § 360k; Medtronic, Inc. v. Lohr, supra, 518 U.S. at pp. 481-482, 116 S.Ct. 2240.) The Supreme Court held that, to the extent plaintiffs alleged injury resulting from the manufacturer's violation of federal regulations, their state common law causes of action against the manufacturer were not preempted. (Medtronic, Inc., supra, at p. 495, 116 S.Ct. 2240.) It observed that a state law damages remedy "does not amount to the additional or different `requirement' that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical existing `requirements' under federal law." (Ibid.)
This court relied on Medtronic in resolving preemption questions with respect to a medical device in Armstrong v. Optical Radiation Corp. (1996) 50 Cal.App.4th 580, 57 Cal.Rptr.2d 763. The case involved causes of action for negligence, strict liability and breach of warranty based on injuries plaintiff received from a medical device. (Id. at p. 583, 57 Cal.Rptr.2d 763.) This court concluded that plaintiff's negligence cause of action was not preempted; to the extent it was based on violation of federal requirements, plaintiff was not seeking to impose different or additional requirements on the manufacturer. (Id. at p. 594, 57 Cal.Rptr.2d 763.)
Insofar as plaintiffs are using the UCL to enforce federal law as set forth in RESPA, they are not seeking to enforce "state laws affecting the operations of federal savings associations." (§ 560.2(a).) The UCL does not "purport[] to regulate or otherwise affect [a savings association's] credit activities" (ibid.) but only provides a means of enforcing federal requirements. It thus is the type of state law not preempted by federal law. (Medtronic, Inc. v. Lohr, supra, 518 U.S. at p. 495, 116 S.Ct. 2240; Armstrong v. Optical Radiation Corp., supra, 50 Cal.App.4th at p. 594, 57 Cal.Rptr.2d 763.)
Moreover, we question whether HOLA and section 560.2 even are applicable in the instant case. RESPA (12 U.S.C., ch. 27, § 2601 et seq.) is not part of HOLA (12 U.S.C., ch.12, § 1461 et seq.). (See 12 U.S.C. § 1461.) That the two are separate suggests that real estate settlement practices *252 are not part of a federal savings association's lending practices and thus are not governed by HOLA. (See People v. Hull (1991) 1 Cal.4th 266, 272, 2 Cal. Rptr.2d 526, 820 P.2d 1036 [chapter headings may be considered in determining legislative intent]; In re Carr (1998) 65 Cal.App.4th 1525, 1530, 77 Cal.Rptr.2d 500 [same].) Additionally, it is well established that a more recent and more specific statute controls over an earlier and more general statute. (Woods v. Young (1991) 53 Cal.3d 315, 324, 279 Cal.Rptr. 613, 807 P.2d 455; David M. v. Beverly Hospital (2005) 131 Cal.App.4th 1272, 1279, 32 Cal. Rptr.3d 649, review den. Nov. 16, 2005.) Section 560.2, which interprets HOLA, thus would be inapplicable in determining whether state laws affecting settlement practices are preempted. Rather, the preemption provisions of RESPA and Regulation X would apply.
In addition, plaintiffs here are using the UCL to enforce general duties imposed on all businesses operating in California, i.e., the duties to refrain from fraudulent and unfair business practices. As noted above, usage of state laws in this manner is not preempted. (Lopez v. World Savings & Loan Assn., supra, 105 Cal.App.4th at p. 742, 130 Cal.Rptr.2d 42; accord, Medtronic, Inc. v. Lohr, supra, 518 U.S. at pp. 500-501, 116 S.Ct. 2240.)
In Hussey-Head v. World Savings & Loan Assn. (2003) 111 Cal.App.4th 773, 4 Cal.Rptr.3d 171, this court addressed the question whether section 560.2 preempted a cause of action under the California Consumer Credit Reporting Agencies Act (Civ. Code, § 1785.1 et seq.). It held that the cause of action was not preempted, in that the state statutes at issue "are not `lending regulations' and they do not purport to govern the manner in which . . . [a] federal savings association runs its business. . . . The California statutory scheme does not come into play until after a loan is made or credit otherwise extended, and it does not affect the manner in which the lender services or maintains the loan; as a result, the California statutes are not inconsistent with the [HOLA]." (Hussey-Head, supra, at p. 782, 4 Cal.Rptr.3d 171.)
Likewise, the duties imposed under the UCL "are not `lending regulations' and they do not purport to govern the manner in which . . . [a] federal savings association runs its business." (Hussey-Head v. World Savings & Loan Assn., supra, 111 Cal.App.4th at p. 782, 4 Cal.Rptr.3d 171.) As Division Five of this court observed in holding UCL and fraud claims were not preempted by HOLA, "actions for fraud are governed almost exclusively by state law, and do not raise issues of great federal interest. [Citation.] There is no reason to suppose that Congress intended to preempt common law tort claims, effectively granting savings associations immunity from such state law claims, and a number of courts have so held. [Citations.] And the Bank's argument that, by permitting fraud and unfair trade practices suits, the state is regulating the Bank's conduct, is off the mark. Plaintiff's ability to sue the Bank for fraud does not interfere with what the Bank may do, that is, how it may conduct its operations; it simply insists that the Bank cannot misrepresent how it operates, or employ fraudulent methods in its operations. Put another way, the state cannot dictate to the Bank how it can or cannot operate, but it can insist that, however the Bank chooses to operate, it do so free from fraud and other deceptive business practices." (Fenning v. Glenfed, Inc. (1995) 40 Cal.App.4th 1285, 1298-1299, 47 Cal.Rptr.2d 715, fn. omitted, review den. Mar. 28, 1996; accord, Hussey-Head, supra, at p. 783, 4 Cal.Rptr.3d 171.)
In summary, plaintiffs have stated a cause of action under the UCL based on *253 fraudulent and unfair business practices. They also have stated a UCL cause of action for unlawful business practices based on violation of RESPA. These causes of action are not preempted by RESPA and Regulation X or by HOLA and section 560.2. Accordingly, the trial court erred in sustaining defendant's demurrer without leave to amend as to the UCL causes of action. (Aubry v. Tri-City Hospital Dist., supra, 2 Cal.4th at p. 967, 9 Cal.Rptr.2d 92, 831 P.2d 317; Jager v. County of Alameda, supra, 8 Cal.App.4th at p. 297, 10 Cal.Rptr.2d 293.)

III

CLRA
The CLRA was enacted "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." (Civ.Code, § 1760.) Plaintiffs claim Washington Mutual's conduct violates the CLRA, specifically Civil Code section 1770, subdivision (a), subsections (14) and (19). These provide: "The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services are unlawful: [¶] . . . [¶] (14) Representing that a transaction confers, or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. [¶] . . . [¶] (19) Inserting an unconscionable provision in the contract."
Plaintiffs cite no authority or make no argument demonstrating that Washington Mutual's actions were undertaken "in a transaction intended to result or which results in the sale or lease of goods or services." (Civ.Code, § 1770, subd. (a), italics added.)[11] Rather, its actions were undertaken in transactions resulting in the sale of real property. The CLRA thus is inapplicable and plaintiffs have demonstrated no error in the trial court's sustaining of defendants' demurrer without leave to amend as to their CLRA cause of action. (City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, 68 Cal.App.4th at p. 459, 80 Cal. Rptr.2d 329; Mansell v. Board of Administration (1994) 30 Cal.App.4th 539, 545-546, 35 Cal.Rptr.2d 574.)

IV

Breach of Contract
A cause of action for breach of contract requires pleading of a contract, plaintiff's performance or excuse for failure to perform, defendant's breach and damage to plaintiff resulting therefrom. (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 476, p. 570.) A written contract may be pleaded either by its terms set out verbatim in the complaint or a copy of the contract attached to the complaint and incorporated therein by reference  or by its legal effect. (Id., §§ 479, 480, pp. 572-573.) In order to plead a contract by its legal effect, plaintiff must "allege the substance of its relevant terms. This is more difficult, for it requires a careful analysis of the instrument, comprehensiveness in statement, and avoidance of legal conclusions." (Id., § 480, p. 573.)
*254 In their breach of contract cause of action, plaintiffs alleged that "Washington Mutual requires its borrowers to pay the cost of automatic underwriting and wire transfers . . . by disclosing on the HUD-1 Settlement Statement the purported costs of these fees." Additionally, "[a]s a condition to obtaining a loan, pursuant to the deed of trust supplied by Washington Mutual, Washington Mutual also requires its borrowers to pay a tax services fee. The deed of trust states that the `Lender may require Borrower to pay a one time charge for a real estate tax verification and/or reporting service used by Lender in connection with this loan.'" Washington Mutual breached its contract "because instead of charging plaintiffs . . . for underwriting, tax services and wire transfer services, Washington Mutual charged plaintiffs . . . amounts in excess of those services."
Plaintiffs have still failed to identify the contract and contractual provision under which Washington Mutual required them to pay underwriting and wire transfer costs. With regard to the fee for tax services, plaintiffs identify the deed of trust as the contract and set forth verbatim the term requiring them to pay the fee.
As plaintiffs point out, "[o]rdinarily, `"all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." [Citation.]' [Citations.]" (City of Torrance v. Workers' Comp. Appeals Bd. (1982) 32 Cal.3d 371, 378-379, 185 Cal. Rptr. 645, 650 P.2d 1162.) The deed of trust thus required that any tax services fee Washington Mutual charged plaintiffs comported with RESPA. (See ibid.) Plaintiffs alleged that the fee violated RESPA. They therefore stated a cause of action for breach of contract, and the trial court erred in sustaining Washington Mutual's demurrer to that cause of action without leave to amend. (Aubry v. Tri-City Hospital Dist., supra, 2 Cal.4th at p. 967, 9 Cal.Rptr.2d 92, 831 P.2d 317; Jager v. County of Alameda, supra, 8 Cal. App.4th at p. 297, 10 Cal.Rptr.2d 293.)

V

Common Law Causes of Action

Unjust Enrichment
Plaintiffs' common law causes of action were for unjust enrichment, breach of bailment agreement and conversion. There is no cause of action for unjust enrichment. Rather, unjust enrichment is a basis for obtaining restitution based on quasi-contract or imposition of a constructive trust. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 1015, 1016, pp. 1104-1105.) Although plaintiffs' second amended complaint states that they are seeking imposition of a constructive trust, they do not explain, with citations to appropriate authority, how they have stated a cause of action therefore. Consequently, plaintiffs fail to demonstrate that they have stated a cause of action for restitution/imposition of a constructive trust. (City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, 68 Cal.App.4th at p. 459, 80 Cal. Rptr.2d 329; Mansell v. Board of Administration, supra, 30 Cal.App.4th at pp. 545-546, 35 Cal.Rptr.2d 574.)

Bailment
A bailment "is made by one giving to another, with his consent, the possession of personal property to keep for the benefit of the former, or of a third party." (Civ.Code, § 1814; Gebert v. *255 Yank (1985) 172 Cal.App.3d 544, 551, 218 Cal.Rptr. 585; 13 Witkin, Summary of Cal. Law, supra, Personal Property, § 156, p. 168.) Plaintiffs allege in their breach of bailment cause of action that they "delivered to Washington Mutual, and Washington Mutual agreed to hold for the benefit of plaintiffs, money to pay the cost of underwriting, tax services and wire transfer services." More specifically, they allege that "Washington Mutual entered into a standard form loan contract with plaintiffs . . ., in which plaintiffs . . . agreed to pay Washington Mutual for the benefit of third parties money for the cost of tax services, and Washington Mutual agreed to pay over to these third party vendors the actual cost for these services and return the remainder to plaintiffs. . . ." In breach of this agreement, Washington Mutual paid only a portion of the money to the third party vendors and kept a portion for itself.
In addition to the facts pleaded in the complaint, trial and appellate courts ruling on a demurrer also "may properly take judicial notice of a party's earlier pleadings and positions as well as established facts from both the same case and other cases. [Citations.] The complaint should be read as containing the judicially noticeable facts, `even when the pleading contains an express allegation to the contrary.' [Citation.] A plaintiff may not avoid a demurrer by pleading facts or positions in an amended complaint that contradict the facts pleaded in the original complaint or by suppressing facts which prove the pleaded facts false. [Citation.]" (Cantu v. Resolution Trust Corp. (1992) 4 Cal.App.4th 857, 877, 6 Cal.Rptr.2d 151, italics omitted; see also, Hendy v. Losse (1991) 54 Cal.3d 723, 742-743, 1 Cal. Rptr.2d 543, 819 P.2d 1.)
The trial court noted in sustaining defendants' demurrer to plaintiffs' first amended complaint that plaintiffs acknowledged at oral argument that they had "no express contractual statement requiring Washington Mutual to limit charges to pass-through costs," so they were relying "on an allegedly implied requirement." Elsewhere in their second amended complaint, plaintiffs allege that the requirement that they pay underwriting and wire transfer fees arises from the HUD-1 statement, not the loan contract. The deed of trust provision that the "`Lender may require Borrower to pay a one time charge for a real estate tax verification and/or reporting service used by Lender in connection with this loan'" does not establish a bailment agreement between plaintiffs and Washington Mutual. Plaintiffs' mere allegation of a bailment agreement contrary to these judicially noticed facts is insufficient to state a cause of action for breach of bailment agreement and withstand defendants' demurrer. (Cantu v. Resolution Trust Corp., supra, 4 Cal. App.4th at p. 877, 6 Cal.Rptr.2d 151.)

Conversion
A cause of action for conversion requires allegations of plaintiff's ownership or right to possession of property; defendant's wrongful act toward or disposition of the property, interfering with plaintiff's possession; and damage to plaintiff. (Burlesci v. Petersen (1998) 68 Cal.App.4th 1062, 1066, 80 Cal.Rptr.2d 704.) Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment. (Fischer v. Machado (1996) 50 Cal.App.4th 1069, 1072-1073, 58 Cal. Rptr.2d 213.) Thus, in Chazen v. Centennial Bank (1998) 61 Cal.App.4th 532, 543, 71 Cal.Rptr.2d 462, plaintiffs stated a cause of action for conversion where the *256 bank took funds from trust accounts to pay the trustee's personal indebtedness.
Here, however, as stated in connection with the breach of bailment cause of action, plaintiffs did not allege that defendants were holding their payments on behalf of another, in essence in trust for the third party vendors. Plaintiffs cite no authority for the proposition that a cause of action for conversion may be based on an overcharge. Consequently, they have failed to demonstrate that they have stated a cause of action for conversion. (City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, 68 Cal. App.4th at p. 459, 80 Cal.Rptr.2d 329; Mansell v. Board of Administration, supra, 30 Cal. App.4th at pp. 545-546, 35 Cal.Rptr.2d 574.)
The order of dismissal is reversed. The trial court is directed to vacate its order sustaining Washington Mutual's demurrer without leave to amend and to enter a new order overruling the demurrer as to plaintiffs' causes of action for violation of the UCL and breach of contract, and sustaining the demurrer as to the remainder of plaintiffs' causes of action. Plaintiffs are to recover costs on appeal.
I concur: MALLANO, J.
VOGEL, J., Concurring and Dissenting.
I concur with the majority opinion insofar as it affirms some parts of the judgment of dismissal but otherwise dissent.

A.
The trial court found that all of Plaintiffs' causes of action turn on the existence of an agreement requiring Washington Mutual to charge no more than the "pass-through" costs for underwriting, tax services, and wire transfers on residential mortgage loan closings. Understandably, the trial court inquired (when it sustained demurrers to Plaintiffs' earlier pleadings) about the factual basis for this agreement. The answer? Washington Mutual "requires its borrowers to pay the cost of automatic underwriting and wire transfers . . . by disclosing on the HUD-1 Settlement Statement the purported costs of these fees" which, by their payment of these fees, Plaintiffs agreed to pay.[1] "[I]nstead of charging Plaintiffs . . . for underwriting, tax services and wire transfer services, Washington Mutual charged Plaintiffs . . . amounts in excess of those services," allegedly leading Plaintiffs to believe they "were paying for the actual cost of such services."[2] Notwithstanding the majority opinion's alternative view, it is on this wobbly foundation that Plaintiffs *257 build their class action claims for violations of the Unfair Competition Law, the Consumers Legal Remedies Act, breach of contract and conversion, alleging that Washington Mutual "illegally charged unearned" fees for these services.
The trial court ultimately concluded that Plaintiffs' allegations, however generously construed, did "not establish an implied contract. Printing charges for underwriting services, etc. on HUD-1 Statements, without more, does not create a requirement that [Washington Mutual] charge pass-through costs. The HUD-1 Statements reflect what Washington Mutual charges customers for settlement services and not (necessarily) what Washington Mutual pays for those services."

B.
Because an implied contract arises from a mutual agreement and intent to promise that have not been expressed in words, the facts from which the promise is implied must be alleged. (California Emergency Physicians Medical Group v. PacifiCare of California (2003) 111 Cal.App.4th 1127, 1134, 4 Cal.Rptr.3d 583.) Notwithstanding Plaintiffs' admissions (in the trial court and on this appeal) that their claims depend on the existence of an implied agreement, the majority opinion finds most of Plaintiffs' claims viable without regard to the existence of an implied (or any) agreement and holds that the allegations about the HUD-1 are sufficient to state a claim for fraudulent and unfair business practices and other statutory violations. In short, the allegations the trial court found insufficient to allege so much as an implied agreement are construed by my colleagues as sufficient to allege an intentional tort and a violation of public policy resulting in harm to consumers. (Typed opn., pp. 241-242.)
The majority opinion is internally inconsistent. After stating that it doesn't matter whether there was an implied agreement, my colleagues dismiss California's history of abstention in cases involving matters of complex economic policy (Desert Healthcare Dist. v. PacifiCare FHP, Inc. (2001) 94 Cal.App.4th 781, 794-795, 114 Cal.Rptr.2d 623; California Grocers Assn. v. Bank of America (1994) 22 Cal. App.4th 205, 27 Cal.Rptr.2d 396; Wolfe v. State Farm Fire & Casualty Ins. Co. (1996) 46 Cal.App.4th 554, 53 Cal.Rptr.2d 878; Korens v. R.W. Zukin Corp. (1989) 212 Cal.App.3d 1054, 261 Cal.Rptr. 137) as irrelevant in this case because the gravamen of Plaintiffs' complaint is that "Washington Mutual leads borrowers to believe it is charging them for the cost of certain services it provides, when in reality it is charging them substantially in excess of such costs." (Typed opn., p. 241) How does this work? How can it be that Plaintiffs need not  and did not  allege facts supporting an implied agreement to charge only "the cost of certain services it provides"  but have nevertheless alleged facts showing that Washington Mutual led them to believe they would be charged only the cost of certain services it provides? In my view, they haven't alleged either claim.[3]

*258 C.
Independent of the facts, I do not agree with the majority opinion's analysis of the law.

1.
Washington Mutual is a federal savings association, authorized and existing under federal law. (12 U.S.C. § 1461 et seq., the Home Owners' Loan Act [HOLA].) As such, its regulation, both by statute and judicial fiat, is preempted by federal law-including such matters as "[l]oan-related fees" and "[p]rocessing" charges. (12 C.F.R. § 560.2(b)(5), (b)(10); Fidelity Federal Sav. & Loan Assn. v. De La Cuesta (1982) 458 U.S. 141, 144-145, 152-153, 102 S.Ct. 3014, 73 L.Ed.2d 664; Glendale Fed. Sav. & Loan Ass'n v. Fox (C.D.Cal.1978) 459 F.Supp. 903, 910.) Although there is an exception for state tort law, that area too is preempted if a statute or judicial ruling would have more than an incidental effect on a federal savings association's lending practices. (Lopez v. World Savings & Loan Assn. (2003) 105 Cal.App.4th 729, 732, 130 Cal.Rptr.2d 42 [an unfair business practice class action challenging a federal savings and loan association's practice of charging a $10 fee for transmission of a payoff demand statement, over and above the fee authorized by Civil Code section 2943, is preempted by federal law]; Washington Mutual Bank v. Superior Court (2002) 95 Cal.App.4th 606, 610, 115 Cal.Rptr.2d 765; American Bankers Association v. Lockyer (E.D.Cal.2002) 239 F.Supp.2d 1000, 1011; Moskowitz v. Washington Mut. Bank, FA. (2002) 329 Ill. App.3d 144, 263 Ill.Dec. 502, 768 N.E.2d 262, 266; Haehl v. Washington Mut. Bank, F.A. (S.D.Ind.2003) 277 F.Supp.2d 933, 940.)
In my view, this entire action is preempted by federal law.

2.
I also disagree with the majority opinion's interpretation of the Real Estate Settlement Procedures Act (RESPA, 12 U.S.C. § 2601 et seq.). RESPA section 8(b) (12 U.S.C. § 2607(b)) does not prohibit "the payment to any person of . . . compensation . . . for services actually performed" (12 U.S.C. § 2607(c)), and no violation occurs unless a lender charges a fee for which the lender provided no settlement services and split that unearned amount with a third party. (Mercado v. Calumet Federal Sav. & Loan Ass'n (7th Cir.1985) 763 F.2d 269, 271; Durr v. Intercounty Title Co. of Illinois (7th Cir. 1994) 14 F.3d 1183, 1187; Echevarria v. Chicago Title & Trust Co. (7th Cir.2001) 256 F.3d 623, 628; Boulware v. Crossland Mortg. Corp. (4th Cir.2002) 291 F.3d 261, 265-267; Krzalic v. Republic Title Co. (7th Cir.2002) 314 F.3d 875; Haug v. Bank of America, N.A. (8th Cir.2003) 317 F.3d 832.)
In my view, the Fourth Circuit's analysis in Boulware defeats the analysis relied on by my colleagues. The plaintiff in Boulware challenged a $65 credit report fee imposed by the lender on the ground that the lender had paid only $15 for the report, precisely the same sort of mark-up challenged in the case now before us. In affirming an order dismissing the action, Boulware held that "[t]he plain language of [12 U.S.C. § 2607(b)] makes clear that it does not apply to every overcharge *259 for a real estate settlement service and that [12 U.S.C. § 2607(b)] only prohibits overcharges when a `portion' or `percentage' of the overcharge is kicked back to or `split' with a third party. . . . By using the language `portion, split, or percentage,' Congress was clearly aiming at a sharing arrangement rather than a unilateral overcharge. . . . [¶] Outside of a kickback or feesplitting situation, there is no way to make sense of the statutory directive that `[n]o person shall give and no person shall accept' any portion of an unearned fee. . . . [¶]
". . . If we were to read [12 U.S.C. § 2607(b)] in the way [the borrower] suggests, every settlement fee would be the subject of potential litigation and discovery, leading perhaps to increased costs for real estate settlement services in the long run. Though the regulation of charging practices would not be beyond the purview of Congress, this was not Congress' intent in enacting RESPA." (Boulware v. Crossland Mortg. Corp., supra, 291 F.3d at pp. 265, 267.)[4]
In sum, I would affirm the judgment of dismissal in its entirety.
NOTES
[1] On demurrer, the facts are those pleaded in the complaint and those of which judicial notice may be taken. (Williams v. Housing Authority of Los Angeles (2004) 121 Cal. App.4th 708, 719, 17 Cal.Rptr.3d 374.)
[2] Defendants are Washington Mutual, Inc., and its divisions and/or subsidiaries: New American Capital, Inc.; Washington Mutual Home Loans, Inc.; Washington Mutual Bank; Dime Bancorp; North American Mortgage Company; Homeside Lending, Inc.; Fleet Mortgage Corp.; The PNC Mortgage Corporation of America; and Bank United Corp. As did the trial court, we refer to defendants collectively as "defendants" or "Washington Mutual."
[3] The Attorney General, in his amicus curiae brief, urges us to hold that Washington Mutual's alleged practices violate RESPA and HUD regulations, that plaintiffs have stated a cause of action for the violation under the UCL, that we should not abstain from deciding the matter, and that plaintiffs' cause of action is not preempted by federal law, as Washington Mutual asserts.
[4] Section 8(a) of RESPA prohibits giving or receiving "any fee, kickback, or thing of value" for a business referral for real estate settlement services. (12 U.S.C. § 2607(a).)
[5] HUD earlier stated its belief "that Section 8(b) of the statute and the legislative history make it clear that no person is allowed to receive `any portion' of charges for settlement services, except for services actually performed. . . . [¶] The interpretation urged, that a single settlement service provider can charge unearned or excessive fees so long as the fees are not shared with another, is an unnecessarily restrictive interpretation of a statute designed to reduce unnecessary costs to consumers. The Secretary, charged by statute with interpreting RESPA, interprets Section 8(b) to mean that two persons are not required for the provision to be violated." (61 Fed.Reg. 29,238-29,239 (June 7, 1996).)

In 2001, in response to a case holding to the contrary (Echevarria v. Chicago Title & Trust Co. (7th Cir.2001) 256 F.3d 623), HUD issued the Real Estate Settlement Procedures Act Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed.Reg. 53052 (Oct. 18, 2001). HUD "reiterate[d] its long-standing position that it may violate Section 8(b) and HUD's implementing regulations . . . for one settlement service provider to mark-up the cost of the services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge . . . ." (Id. at p. 53052.)
HUD also pointed out that "[i]n 1999, by letter submitted at the request of the Superior Court of California, Los Angeles County, in the case of Brown v. Washington Mutual Bank (Case No. BC192874), HUD provided the following response to a specific question posed by the court on lender `markups' of another settlement service provider's fees: [¶] `A lender that purchases third party vendor services for purposes of closing a federally related mortgage loan may not, under RESPA, mark up the third party vendor fees for purposes of making a profit. HUD has consistently advised that where lenders or others charge consumers marked-up prices for services performed by the third party providers without performing additional services, such charges constitute "splits of fees" or "unearned fees" in violation of Section 8(b) of RESPA.' [¶] HUD noted in its letter to the court that the response reflected the Department's long-standing position." (66 Fed.Reg. at p. 53058.)
[6] Congress authorized the Secretary of HUD "`to prescribe such rules and regulations, [and] to make such interpretations . . . as may be necessary to achieve the purposes of [RESPA].' 12 U.S.C. § 2617(a)." (Kruse v. Wells Fargo Home Mortg., Inc., supra, 383 F.3d at p. 59, fn. omitted.)
[7] According to HUD, "`[a]ny . . . document that is published in the Federal Register by the Secretary and states that it is an "interpretation," "interpretive rule," "commentary," or a "statement of policy" for purpose of [12 U.S.C. § 2617(a)]' constitutes `a rule, regulation or interpretation of the Secretary.' 24 C.F.R. § 3500.4(a)(1)(ii) ([italics] added)." (Kruse v. Wells Fargo Home Mortg., Inc., supra, 383 F.3d at p. 59, fn. 9.) Moreover, the policy statement at issue "explicitly identified itself as having been promulgated in the exercise of HUD's congressionally delegated authority." (Id. at pp. 59-60.)
[8] The court also noted that other circuits had deferred to the policy statement in determining whether certain practices violated section 8(a) of RESPA (12 U.S.C. § 2607(a)). (Kruse v. Wells Fargo Home Mortg., Inc., supra, 383 F.3d at p. 61.)
[9] RESPA provides in chapter 27 of Title 12 of the United States Code, section 2616, that it "does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provision of this chapter, and then only to the extent of the inconsistency. The Secretary is authorized to determine whether such inconsistencies exist. The Secretary may not determine that any State law is inconsistent with any provision of this chapter if the Secretary determines that such law gives greater protection to the consumer. . . .'

Regulation X similarly provides in 24 Code of Federal Regulations section 3500.13: "(a) State laws that are inconsistent with RESPA or this part are preempted to the extent of the inconsistency. However, RESPA and these regulations do not annul, alter, affect, or exempt any person subject to their provisions from complying with the laws of any State with respect to settlement practices, except to the extent of the inconsistency. [¶] (b) Upon request by any person, the Secretary is authorized to determine if inconsistencies with State law exist. . . . [¶] (1) The Secretary may not determine that a State law or regulation is inconsistent with any provision of RESPA or this part, if the Secretary determines that such law or regulation gives greater protection to the consumer. . . ."
[10] The court also rejected the Attorney General's claim that the OTS did not have the authority to promulgate section 560.2. (Lopez v. World Savings & Loan Assn., supra, 105 Cal.App.4th at p. 745, 130 Cal.Rptr.2d 42.) The Attorney General makes the same claim in the instant case, adding that, even if section 560.2 is valid, it does not support preemption in this case.
[11] The CLRA defines "goods" as "tangible chattels bought or leased for use primarily for personal, family, or household purposes, . . . including goods which, at the time of the sale or subsequently, are to be so affixed to real property as to become part of real property, whether or not severable therefrom." (Civ. Code, § 1761, subd. (a).) It defines "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." (Id., subd. (b).)
[1] The United States Department of Housing and Urban Development describes its HUD-1 form "as a statement of actual charges and adjustments to be given to the parties in connection with the settlement" of a real estate sale transaction. (http://www.hud.gov/offices/hsg/sfh/res/ resappa.cfm [as of Aug. 15, 2006].) On its face, the form says it is provided to the parties as "a statement of actual settlement costs," and that the amounts "paid to and by the settlement agent" are shown. (Italics added.) Although the HUD-1 doesn't say anything about amounts actually paid by the lender or seller or anyone else, the gist of this lawsuit is that the reference to "actual cost" constitutes an implied agreement between Washington Mutual and its borrowers to the effect that Washington Mutual will not charge the borrowers any fee that it hasn't been charged, penny for penny, for underwriting, tax services, and wire transfers.
[2] Or, as Plaintiffs' counsel put it at one of the hearings, the agreement is "implied in the HUD-1 that [the charge shown is] not something beyond a pass through. And when there's a payment to a third party, when there's nothing else being provided, the implication would be or certainly a reasonable understanding would be that the person only has to pay what it cost and not a markup."
[3] I simply don't understand Part IV of the majority opinion. It says that "Plaintiffs have still failed to identify the contract and contractual provision under which Washington Mutual required them to pay underwriting and wire transfer costs. With regard to the fee for tax services, plaintiffs identify the deed of trust as the contract and set forth verbatim the term requiring them to pay the fee." (Typed opn., p. 254.) The majority opinion concludes the allegations are sufficient to state a breach of contract cause of action because the tax service fee allegedly violated RESPA and that the deed of trust is the contract. A deed of trust is the document by which a borrower gives the lender a lien on property to secure the borrower's loan obligation. (Alliance Mortgage Co. v. Rothwell (1995) 10 Cal.4th 1226, 1235, 44 Cal.Rptr.2d 352, 900 P.2d 601.) Deeds of trust are signed by the borrower (trustor), not the lender (beneficiary). (Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2006) ¶ 6:336 et seq., p. 6-68.1 et seq. & Forms 6H and 6I, pp. 6-186 to 6-220.) While there are surely other loan documents signed by Washington Mutual, my nickel says the deed of trust isn't one of them.
[4] The majority opinion's discussion of Washington Mutual Bank v. Superior Court (1999) 75 Cal.App.4th 773, 89 Cal.Rptr.2d 560 mixes apples with oranges  preemption vis-à-vis the regulation of federal savings and loan associations under HOLA with preemption under RESPA  and suggests that HOLA does not apply here because RESPA is not part of HOLA. (Typed opn., pp. ___-___.) The case relied on by the majority opinion, Hussey-Head v. World Savings & Loan Assn. (2003) 111 Cal.App.4th 773, 4 Cal.Rptr.3d 171, does not support the majority opinion's leap in logic. To the contrary, Hussey-Head, which I wrote, holds only that an action for fraud under the California Consumer Credit Reporting Agencies Act (Civ.Code, § 1785.1 et seq.)  alleging that the lender provided false credit information about the plaintiff  had nothing to do with lending regulations and thus was not preempted by HOLA. (Hussey-Head v. World Savings & Loan Assn., supra, 111 Cal.App.4th at pp. 780-783, 4 Cal.Rptr.3d 171 [holding that Civil Code section 1785.1 et seq. did no more than recognize the fact that creditors voluntarily report credit information to credit reporting agencies].)