Filed 6/27/13  Stewart v. First California Bank CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SYLVESTER STEWART et al., | B236286 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC430809) |
| v. | |
| FIRST CALIFORNIA BANK et al., | ORDER MODIFYING OPINION AND DENYING REHEARING PETITION |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on May 30, 2013, be modified as follows:

On page 25, first full paragraph, in the third sentence that begins "Accordingly, Roberts' breach" delete the following:  ", as he concedes,".  The sentence now reads: "Accordingly, Roberts' breach of contract cause of action is not time-barred, but he may only seek to recover payments dating back four years from the filing of the action against BMI. (Code Civ. Proc. § 337.)"

No change in judgment.

The petition for rehearing is denied.

_____          _____

O'NEILL, J.[*]                              TURNER, P.J.

---

[*]        Judge of the Ventura County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 5/30/13 (unmodified version)
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SYLVESTER STEWART et al., | B236286 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC430809) |
| v. | |
| FIRST CALIFORNIA BANK et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark V. Mooney, Judge. Affirmed in part, reversed in part with directions.

Allan Law Group, Robert J. Allan, Edythe E. Huang; Scheper Kim & Harris, David C. Scheper, William H. Forman and Julio V. Vergara for Plaintiffs and Appellants.

Davis Wright Tremaine, Mary H. Haas, Carla A. Veltman and Law Offices of Richard A. Shaffer and Richard A. Shaffer for Defendant and Respondent First California Bank.

Mitchell Silberberg & Knupp, Marc E. Mayer, Andrew C. Spitser for Defendants and Respondents Warner/Chappell Music, Inc. and Warner-Tamerlane Publishing Corp.

Law Offices of Peter J. Anderson, Peter J. Anderson for Defendant and Respondent Sony Music Entertainment.

Ballard Spahr Andrews & Ingersoll, Penny Marie Costa, Corey Field and Rosina Maria Hernandez for Defendant and Respondent Broadcast Music, Inc.

# I. INTRODUCTION

Plaintiffs/appellants Sylvester Stewart ("Stewart") and Ken Roberts ("Roberts") brought suit against a large number of individuals and entities, including those involved in this appeal, defendants/respondents Sony Music Entertainment ("Sony"), Warner/Chappell Music, Inc. and Warner-Tamerlane Publishing Corp. ("Warner"), Broadcast Music, Inc. ("BMI"), and First California Bank ("Bank"). Through multiple causes of action, plaintiffs seek recovery of past and future royalty payments for musical works authored and produced by plaintiff Stewart, who rose to prominence in popular music as "Sly Stone" in the late 1960's and early 1970's. Stewart was also the lead performer of the works, as "front man" for the band known as "Sly and the Family Stone." Roberts was Stewart's friend and one-time manager, and an assignee of some of Stewart's royalty rights.

The court below sustained these defendants' demurrers without leave to amend. We will affirm, except as to plaintiff Roberts' breach of contract and declaratory relief causes of action against defendant BMI. Roberts' conversion claim against BMI was properly dismissed. Plaintiff Stewart's several causes of action against Sony, Warner, and BMI were also properly dismissed by the trial court.

Following oral argument before this Court, both plaintiffs dismissed their appeals as to defendant Bank.

# II. PROCEDURAL HISTORY

In a series of complaints filed between January 28, 2009 and May 10, 2011, plaintiffs Stewart and Roberts made claims against nearly three dozen individuals and entities. The Fourth Amended Complaint (4AC) consists of 88 pages, supplemented by 142 pages of attachments. It includes 35 causes of action, 13 of which name one of the three defendants involved in this appeal. They are as follows:

Stewart v. Sony (23d for Breach of contract, 24th for Conversion, 25th for Negligence, 26th for Accounting, 27th for Declaratory relief);

Stewart v. Warner (28th for Conversion, 29th for Accounting, 30th for Declaratory relief);

Stewart v. BMI (31st for Breach of contract, 32nd for Accounting); and

Roberts v. BMI (33d for Conversion, 34th for Breach of "written agreement," 35th for Declaratory relief).

In June of 2011, these defendants' demurrers to all of the above-listed causes of action were sustained without leave to amend. Plaintiffs filed these timely appeals.

## III. FACTUAL SUMMARY

We summarize the pertinent facts alleged in the Fourth Amended Complaint and exhibits thereto, with occasional references to earlier versions of the complaint. (*Berg & Berg Enterprises, LLC v. Boyle* (2010) 178 Cal.App.4th 1020, 1034 [the court "may consider the factual allegations of prior complaints, which a plaintiff may not [contradict]. . ." in an amended pleading]; *Performance Plastering v. Richmond American Homes of California, Inc.* (2007) 153 Cal.App.4th 659, 665 ["We also consider matters shown in exhibits attached to the complaint and incorporated by reference."] [Citation.])

### A. Overview Of The Complaint

The Fourth Amended Complaint begins with a summary stating the action arises from the misappropriation of "tens of millions" of dollars by defendant Gerald "Jerry" Goldstein ("Goldstein") and his business partners (collectively, the "Goldstein Group") in

concert with, among others, defendants Sony, Warner and BMI, who are referred to collectively as the "royalty distribution companies."[1]

In the 1960's, Stewart signed recording contracts with Sony, and agreements with Warner and BMI to exploit the compositions and recordings. Roberts became Stewart's manager in the early 1970's. In 1975, Stewart assigned his BMI royalty rights to Roberts. In 1989, defendants Goldstein, Glenn Stone ("attorney Stone") and Stephen Topley ("Topley") "induced" Stewart to sign an "Employment Agreement" and a "Shareholders Agreement." The latter created an entity called Stone Fire Productions, later known as Even St. Productions Ltd. (Even Street). Based on what he was told, Stewart thought he was simply agreeing to hire Goldstein, attorney Stone and Topley, working through Even Street and an entity called TAG Management, Inc. ("TAG"), as his personal and business managers. The written agreements, however, "did not comport with the terms discussed between the parties." For over two decades thereafter, the Goldstein Group used the fraudulently obtained Employment Agreement to "divert, convert and misappropriate" Stewart's royalties. Goldstein convinced Stewart that his royalties were minimal due to tax liens and levies, and that, in light of his tax problems, Stewart could not have assets in his name or receive royalties directly. Several entities ("Goldstein Music Companies") were empowered to collect Stewart's royalties.

Beginning in 1997 the Goldstein Group and the entities they controlled borrowed millions of dollars from former defendant Bank, secured by Stewart's future royalties. Under the Employment Agreement, the loan proceeds did not belong to Stewart. In 2008 Goldstein told Stewart he would receive no further advances of funds from the Goldstein Music Companies, leaving Stewart virtually destitute and dependent on friends for housing and support.

The royalty distribution companies "disregarded signed contracts and assignments" between Stewart and Roberts, allowing royalties to be diverted to

---

[1]     The introductory section of the Fourth Amended Complaint makes no mention of defendant Bank. Nor does it mention a highly significant document, the "1989 Assignment."

"improper entities." The royalty companies acted without "due diligence" and "in some instances . . . with knowledge that [Stewart] was not aware of" agreements between Even Street and the royalty companies.

The introduction to the Fourth Amended Complaint concludes by stating plaintiffs are seeking past and future royalties and declaratory relief.

### B. Detailed Summary of Plaintiffs' Factual Allegations

#### 1. Stewart, aka Sly Stone

Stewart, a musician since childhood, became a prolific composer of over 300 registered songs. He and his band, Sly and the Family Stone, developed an international reputation based on several "top 40" hit songs written by Stewart, and performances including an appearance at the Woodstock, New York concert in 1969. The band, a racially diverse group of men and women, was considered socially progressive. Their performances of Stewart's music were influenced by multiple genres. The band was inducted into the Rock and Roll Hall of Fame in 1993, and Stewart was honored as an influential musician by *Rolling Stone* magazine. Stewart's songs continue to be played by other performers and on the radio and elsewhere, and have been used in several movies in recent years.

Stewart had no business or money management experience; as a result, he has always been dependent on managers and other advisors for handling of his personal and professional financial affairs. Stewart engaged in substance abuse during his performing years, resulting in a lifelong addiction to cocaine and sedatives. This allegedly made him "particularly susceptible to the duress and undue influence of" Goldstein, Topley and attorney Stone.

## 2. Roberts

Roberts became Stewart's "personal and professional manager" in the early 1970's. Between 1975 and 1982, he advanced money to Stewart and paid some of Stewart's debts to third parties. To repay Roberts, in January of 1976 Stewart executed an "irrevocable" assignment ("1976 Assignment") of his BMI royalties to Roberts and/or Ken Roberts, Inc., an entity wholly owned and controlled by Roberts.

## 3. Stewart, Roberts, BMI and the Internal Revenue Service

Defendant BMI is a not-for-profit performing rights organization. It distributes all of its income, after deducting operating expenses and reasonable reserves, to its affiliated music publishers and songwriters. Through affiliation agreements with copyright owners, BMI acquires non-exclusive public performance rights. BMI, in turn, enters into license agreements which grant to music users, such as broadcasters and the operators of concert halls, the right to publicly perform any of the works in BMI's repertoire.

In 1964, plaintiff Stewart entered into an affiliation agreement with BMI that was amended and extended numerous times until March of 1979, when Stewart entered into a new agreement with BMI (the "1979 BMI Affiliation Agreement"), in which Stewart granted BMI the right to collect royalties on his behalf in exchange for BMI paying royalties and providing royalty statements to the party entitled to receive them. Under the terms of the 1979 BMI Affiliation Agreement, Stewart was obligated to notify BMI promptly of any change of his address.

Beginning in 1976, BMI paid Stewart's royalties to his then-manager, plaintiff Roberts, pursuant to the aforementioned 1976 Assignment. In April of 1979, Stewart, Roberts and BMI "modified" the 1976 Assignment of the BMI royalties in a writing signed by all three parties (the "1979 BMI Modification"). That document identified "Majoken Inc.," a corporation formed by Roberts in New York in 1975, "as successor in interest to Ken Roberts Enterprises." BMI was directed to begin paying Stewart's

royalties, approximately $30,000 a year at that time, to "Majoken, Inc." ("Roberts-Majoken").  BMI followed this directive (the "1979 BMI Amendment") until the IRS levied a multi-million dollar tax lien upon Stewart's BMI royalties in 1980.  Until the lien was lifted in 1996, BMI paid the royalties directly to the IRS.

Stewart and Roberts were unaware that negotiations between an attorney hired by the Goldstein Group and the IRS resulted in the lifting of the lien in July of 1996.  At about that time, a new entity called "Majoken, Inc." ("Goldstein-Majoken"), was formed by Goldstein, Topley and attorney Stone without the knowledge or consent of Stewart or Roberts.  In an August 1996 letter, attorney Stone instructed BMI to begin sending the BMI royalty checks to "Majoken, Inc." at the Los Angeles address of Even Street. BMI began doing so shortly before the letter was sent, and did so until 2009, when BMI was informed by Stewart's attorney about the existence of two companies named "Majoken, Inc."  Pursuant to attorney Stone's instructions, BMI had been sending royalty *statements* to attorney Stone since 1989.[2] Between 1996 and 1999[3] BMI paid approximately $600,000 in royalties to Goldstein-Majoken.

Unbeknownst to BMI, Roberts-Majoken was dissolved by the State of New York in 1991 and remained defunct until its reinstatement in 2009, shortly before Stewart and Roberts filed the instant lawsuit.  For more than 30 years, from 1979 through 2009, the BMI royalties were made payable to either the IRS or "Majoken, Inc."  During this period neither Stewart nor Roberts nor anyone on their behalf ever complained to BMI that they were not receiving royalty payments or statements.  No one ever advised BMI to cease sending royalty payments and statements to Majoken, Inc.  In 2009, BMI provided

---

[2]     In the 1989 Assignment, discussed below, Stewart assigned his BMI royalty rights to Even Street, without purporting to revoke the 1976 assignment to Roberts.

[3]     "1999" may be a typographical error in the Fourth Amended Complaint, since the royalty payments discussed here continued until 2009. In any event, plaintiffs alleged based on the facts summarized in the text accompanying this footnote, that "BMI knew or should have known through the exercise of reasonable diligence of the fraudulent activity of the Goldstein Collaborators…."

Stewart's attorney with copies of all of Stewart's royalty statements, along with other documents counsel had requested.

## 4. Stewart and Sony

Under three 1967 and 1972 recording contracts, Stewart rendered services as a recording artist to Epic Records, a division of CBS Records, Sony's predecessor ("CBS/Sony"). The first contract, dated June 6, 1967 when Stewart was 22 years old, assigned to CBS/Sony all rights in eight Sly and The Family Stone master recordings made the previous month. The second contract, dated June 7, 1967, provided that Stewart and Sly and the Family Stone would render recording services to CBS/Sony for up to five years, or until 1972. The third contract, dated September 15, 1972, extended those recording services for up to another four-and-a-half years or until ten master recordings had been delivered. Under the recording contracts, CBS/Sony received certain rights to the master recordings and agreed to pay Stewart royalties. In 1977, Stewart and Sony released each other from all obligations except Sony's continuing obligation to pay royalties to Stewart and Stewart's right to audit Sony's accountings.

From 1989 until 2009, Sony paid royalties under the 1967 and 1972 Sony recording contracts to Even Street, pursuant to the 1989 Assignment by Stewart to Even Street, which is discussed further below. Sony was not given notice of the 1989 Employment Agreement, also discussed further below. Stewart did not contact Sony directly before 2009, and Sony took no steps to determine the validity of the 1989 Assignment.

In 2002, Stewart's managers, Goldstein, Topley and Stone, negotiated an agreement between Sony and Even Street (the "2002 Sony Agreement"), which provided for new advances and royalty rates for Sony's exploitation of the master recordings created under the 1967 and 1972 recording contracts. This agreement included the right to market re-releases, re-mixes, a compact disc box set of Sly and The Family Stone albums and to create a web-site. Even Street retained certain veto powers as to the

content of new products. The 2002 Agreement also settled an audit claim. A draft of the 2002 Sony Agreement included Stewart's signature line, but in the final version the signature line was replaced with Even Street's warranty of both its authority and Stewart's knowledge of the 2002 Sony Agreement's terms. Sony did not further investigate the issue of Stewart's awareness or consent to the new agreement. However, Sony asked for and received from the Goldstein Group a draft press release for use in the event Stewart contested the authority of the Goldstein Group enter into the 2002 Sony Agreement.

## 5. Stewart and Warner

In 1985, Stewart sold his publishing interest in most of his existing musical compositions (the "Stone compositions") to Michael Jackson's MiJac Music, retaining only the right to 100% of the "songwriter's share" of the royalties. Thereafter, the Warner defendants, who are publishers specializing in administration of the written words and notes of musical compositions, administered and exploited the Stone compositions pursuant to its contract with MiJac. Warner's duties included collecting and paying out the songwriter's royalties.

Between 1985 and 1989, Warner paid Stewart's royalties to the IRS pursuant to a tax lien. After the lien was lifted in 1989 and Warner received notice of the 1989 Assignment, Warner distributed royalties to Stone Fire Productions, Inc. and its successors and assignees (including Even Street and former defendant Bank) in reliance on the 1989 Assignment. For the following 20 years, neither Stewart nor anyone else objected to Warner's actions regarding the royalties.

As noted below, Bank made a series of loans to Even Street and its subsidiary, Goldstein-Majoken, which were secured in part by the Warner royalties. From 1999 to 2008 the Warner royalties were assigned to Bank by Goldstein and Even Street. Bank applied the Warner royalties it collected to the loan balance and related fees.

## 6. Stewart and the Goldstein Group

Stewart first met Goldstein in the 1960s and by 1989 they had known each other for over 20 years. Goldstein had extensive experience as the producer of hit songs and in financial management in the music business. Stewart first met Topley in the late 1960's when Topley worked for Epic Records and was assigned to promote "Sly and the Family Stone." Attorney Stone was introduced to Stewart by Goldstein in late 1988 or early 1989; Goldstein told Stewart attorney Stone was legal counsel for Goldstein's music companies.

By early 1989, Stewart's addiction to cocaine and sedatives had resulted in legal trouble, including the aforementioned tax liens and levies. He was a fugitive and he had no record deal or other substantial income. Between December of 1988 and February of 1989 Goldstein, through his company Goldstein Music, made approximately 30 loans to Stewart in amounts ranging from one hundred to several hundred dollars. The money was used to pay Stewart's living expenses and to fuel his drug addictions. Goldstein and attorney Stone gave cocaine to Stewart on several occasions. In late February of 1989, Goldstein, Topley and attorney Stone told Stewart that Goldstein had obtained a new recording contract for Stewart. They told Stewart there would be no more loans or drugs, and no recording contract, unless Stewart signed an agreement providing that their entity, Even Street, would become manager of all of Stewart's personal and professional financial affairs. They promised to help Stewart and advised that because of the tax problems, Stewart should not have any assets in his name or receive royalties directly.

Trusting Goldstein, Topley and attorney Stone, Stewart agreed. Three documents, which Stewart had no role in preparing, were executed in February 1989 to confirm the arrangement. Stewart was told and believed the documents established a standard professional and business management arrangement whereby Goldstein, Topley and attorney Stone would provide services in return for standard fees based on a percentage of the income earned. Instead, unbeknownst to Stewart, the documents provided that Stewart would become the employee of Even Street.

The first document was the "Shareholders Agreement," which provided Even Street (then known as "Stone Fire Productions Ltd.") would be owned equally by Stewart and defendant TAG Management, Inc. ("TAG"), a Goldstein company. The Shareholders Agreement also states Even Street would "employ" Stewart.

The second February 1989 document was the "Employment Agreement," whereby Even Street obtained Stewart's services in the music industry, agreed to use best efforts to advance his career and agreed to pay him 50% of Even Street's net profits. The Employment Agreement provided for a five-year term and allowed Stewart to terminate his employment if he did not receive minimum payments ranging from $75,000 to $250,000 a year. The Employment Agreement included, unbeknownst to Stewart, his express appointment of Even Street, and his managers, Topley and Goldstein, as his attorneys-in-fact. Their authority included signing music related contracts on Stewart's behalf. After the 1989 Employment Agreement's stated five-year term expired, Stewart continued to allow the Goldstein Group to manage his financial and personal affairs through 2009. Stewart never received a copy of the Employment Agreement before 2009.

The third February 1989 document, which Stewart initialed and signed, is a notarized assignment ("the 1989 Assignment") to Stone Fire Productions Ltd., later renamed Even Street, of all rights and benefits resulting from "the prior exploitation" of Stewart's "skills, talents and services in the entertainment industry, including but not limited to, as a musician, composer, arranger, publisher, recording artist, actor, writer and performing artist." The 1989 Assignment expressly includes all royalties due or to become due from CBS/Sony, BMI and Warner. The 1989 Assignment also includes, "without limitation, " the full right to settle or compromise claims on the assigned rights. The document makes no mention of Roberts, or of the 1976 "irrevocable" Assignment to Roberts of Stewart's BMI royalties.

Once the Goldstein Group became his managers in 1989, Stewart relied on them to deal with defendants Sony, BMI and Warner regarding royalty distribution. Stewart often asked Goldstein about royalties. Goldstein told him the amounts received did not exceed those Even Street had paid to Stewart or on his behalf. Stewart's repeated

requests that his managers show him reports or documents concerning royalties, as well as the books and records of Even Street, were ignored.

### 7. The Goldstein Group, First California Bank and the royalty rights

Between 1997 and 2009, former defendant Bank made approximately 24 loans to Even Street, Goldstein-Majoken and other Goldstein entities, totaling at least $5 million. The loans were secured in part by Stewart's music royalties.

Eventually, Goldstein executed assignments of Goldstein-Majoken's "right" to receive the BMI and Warner royalties, allowing Bank to collect the royalties directly. From 1999 to 2008, Bank received BMI royalties by direct assignment from Goldstein and Goldstein-Majoken. Bank applied these monies to the balance owed and fees due for the Goldstein and Goldstein-Majoken loans. From 1996 through 2009, BMI paid to Goldstein-Majoken and Bank a total of $3,292,675.82).

### 8. Events shortly before the filing of this action

In 2008 Goldstein had stopped giving Stewart advances, leaving him destitute. With the help of friends, in 2009 Stewart obtained a copy of his 1989 Employment Agreement with Even Street, allegedly realizing for the first time that it provided he was a mere employee. [4]

In 2009, after Stewart provided his Employment Agreement to Sony, BMI and Warner, royalty distributions were suspended. Eventually, the accruing royalty funds were interpleaded in this lawsuit.

On January 7, 2010, days before plaintiffs filed their initial complaint in this action, Roberts provided BMI with a declaration in which he stated that he and Majoken,

---

[4] As defendants point out, Stewart nowhere alleges he misunderstood the 1989 Assignment.

Inc. are owed nothing under the assignments from Stewart. After first noting that the 1976 Assignment had been given to him and Ken Roberts Enterprises, Inc. as security for loans they had made to Stewart, Roberts declared under penalty of perjury, "At this time, no monies are due and payable by Sly Stone to me or Majoken, Inc."

On January 28, 2010, plaintiffs filed their initial complaint against 23 individuals and entities. [5]

## IV. STANDARD OF REVIEW

We independently review the record to determine if the trial court erred in sustaining a demurrer. (*Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1115.) In conducting a de novo review, "we independently review the pleading to determine whether the facts alleged state a cause of action under any possible legal theory. (Citations.)" (*Long v. Century Indemnity Co.* (2008) 163 Cal.App.4th 1460, 1467.) The appealing "[p]laintiff bears the burden of proving the trial court erred in sustaining the demurrer or abused its discretion in denying leave to amend." (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1469 (*McKell*).)

"'Our only task . . . is to determine whether the complaint states a cause of action. Accordingly we assume that the complaint's properly pleaded material allegations are true and give the complaint a reasonable interpretation by reading it as a whole and all its parts in their context. [Citations.] We do not, however, assume the truth of contentions, deductions, or conclusions of fact or law.' [Citation.]" (*People ex rel. Lungren v. Superior Court* (1996)14 Cal.4th 294, 300-301.) Nor do we accept as true allegations

---

[5] In addition to the three defendants involved in this appeal and former defendant Bank, plaintiffs sued Gerald Goldstein, Claire Levine, Jaclyn Levine, Stephen Topley, Glenn Stone, Elva Hackney, Columbia Street, Inc., T.A.G. Management, Inc., Even St. Productions Ltd., Majoken Inc., TMC Music, Inc., Far Out Productions, Jerry Goldstein Music, Inc., Audio Visual Entertainment, Inc., Amadeus Capital Investors, LLC, Amadeus B, LLC, Gerald Goldstein Revocable Trust, and the Amadeus Trust.

that are contradicted by exhibits to the complaint. In that circumstance, we accept as true the contents of the exhibits unless they are ambiguous. (*SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 83; *Banis Restaurant Design, Inc. v. Serrano* (2005) 134 Cal.App.4th 1035, 1044-45.) We may not assume "the [plaintiff] can prove facts that [he or she] has not alleged." (*Associated General Contractors of California, Inc. v. California State Council of Carpenters* (1983) 459 U.S. 519, 526, [103 S. Ct. 897, 74 L. Ed. 2d 723.])

Like the court below, we may take judicial notice of certain facts, including ". . . a party's earlier pleadings and positions as well as established facts from both the same case and other cases. [Citations.] The complaint should be read as containing the judicially noticeable facts, "'even when the pleading contains an express allegation to the contrary.'" [Citation.] A plaintiff may not avoid a demurrer by pleading facts or positions in an amended complaint that contradict the facts pleaded in the original complaint or by suppressing facts which prove the pleaded facts false." (*McKell*, supra, 142 Cal.App.4th at p. 1491.)

When a pleading "reveals that [plaintiff] lacks either the right or standing to sue, it is vulnerable to a general demurrer on the ground that it fails to state a cause of action." (*Carsten v. Psychology Examining Comm.* (1980) 27 Cal.3d 793, 796.) Similarly, a demurrer must be sustained where the face of the complaint demonstrates clearly and affirmatively that the right of action is barred by the statute of limitations. (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 881.)

Applying these standards, we "liberally construe [the pleading] with a view to substantial justice between the parties." (Code Civ. Proc., § 452; *Kotlar v. Hartford Fire Insurance Co.* (2000) 83 Cal.App.4th 1116, 1120.) We will "affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons." (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 111.)

While leave to amend is liberally granted, ". . . [i]t should not be granted where . . . amendment would be futile." (*Vaillette v. Fireman's Fund Insurance Co.* (1993) 18

Cal.App.4th 680, 685; *Long v. Century Indemnity Co.*, *supra*, 163 Cal.App.4th at p.1467.)  "[W]e decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.  [Citations.]  The burden of proving such reasonable possibility is squarely on the plaintiff.  [Citation.]"  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

## V.  DISCUSSION

### A.  Stewart's Separate Claims

#### 1.  Stewart concedes he lacks standing to sue BMI

Stewart sued BMI for breach of contract and accounting.  The claims are grounded on the allegation that BMI wrongfully failed to furnish Stewart with royalty *statements* at least twice a year, beginning in 1989.

There is no dispute that Stewart assigned his BMI royalty payments to plaintiff Roberts and/or his designee in 1976.  Stewart assigned them to Even Street in 1989.  These assignments included the right to receive "[a]ll monies payable pursuant to [Stewart's Affiliation Agreement with BMI] and any extensions or modifications thereof."  Presumably, the right to receive statements was assigned along with the right to royalty payments.

By assigning his BMI royalty rights, Stewart relinquished his standing to bring suit.  Once rights are assigned, the assignee "stands in the shoes of the assignor," and "the assignor lacks standing to sue on the claim."  (See Civ. Code § 1458; *Johnson v. County of Fresno* (2003) 111 Cal.App.4th 1087, 1096 (*Johnson*).)

Apparently conceding this issue, Stewart does not challenge the trial court's ruling as to his causes of action against BMI.

## 2. Stewart lacks standing to sue Sony

Stewart sued Sony for breach of contract, conversion, negligence, accounting and declaratory relief. The claims are grounded on the allegations that Stewart still owns royalty or other rights in the master recordings under the 1967 and 1972 recording contracts, that Sony wrongfully paid Stewart's royalties to Even Street and Goldstein-Majoken, and that the 2002 Sony Agreement was invalid.

The trial court, while questioning whether royalty payments can be the subject of a conversion, ruled that the facially valid 1989 Assignment was properly relied on by Sony, which, for over two decades, had no notice of any contention the Assignment was invalid, or that Stewart objected to the way the royalties were being paid. We agree with the trial court's conclusion.

The 1989 Assignment included the Sony royalties, and the fourth amended complaint specifically alleges that Sony received the 1989 Assignment and complied with it in distributing the royalties to Even Street and Goldstein-Majoken. The 1989 Assignment reads:

"ASSIGNMENT [¶] For One ($1.00) Dollar, and other good and valuable consideration, receipt of which is hereby acknowledged SYLVESTER STEWART p/k/a Sly Stone ("Assignor") hereby assigns, transfers, sets over and conveys to STONE FIRE PRODUCTIONS LTD. ("Assignee"), all rights, title and interest in and to any and all claims, rights, causes of action and benefits now known or unknown resulting from the prior exploitation of the Assignor' s skills talents and services, in the entertainment industry including but not limited to, as a musician, composer, arranger, publisher, recording artist, actor, writer and performing artist. Said assignment shall include but not be limited to the following: [¶] 1. Any royalty or other income now due past due or to become due from CBS RECORDS. [¶] 2. Any royalty or other income now due, past due, or to become due from WARNER/CHAPPELL MUSIC, INC. including but not limited to publishing royalties and income, and writer's royalties and income. [¶] 3. Any royalty or other income now due, past due, or to become due from BMI, INC.

including but not limited to publisher's peformance [sic] royalties or income, and writer's performance royalties and income. [¶] The within named assignment, transfer and conveyance includes without limitation any and all rights that Assignor now has or to which Assignor may become entitled under existing or subsequently enacted federal, state or foreign laws. The within grant further includes all proceeds from the foregoing accrued and unpaid and hereafter accruing and all such claims, rights, causes of action benefits arising therefrom without limitation with full right to maintain any actions thereon, and to settle, compromise, or reassign such claims, and to get a release in Assignor's name in full discharge of the liability thereunder."

Stewart would have us reject the plain meaning of the 1989 Assignment based on bare allegations of ambiguity. We decline to do so here, as did Division Eight of our court in *George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112 (*George*). In *George* the court applied the usual rules of contract interpretation in the context of a demurrer involving an insurance policy. (*Id.* at p. 1120.) The court rejected the argument that a mere allegation of ambiguity, even if supported by allegations of "unidentified extrinsic evidence, requires a demurrer to be overruled." (*Id.* at pp. 1127-28.) Instead, in ruling on a demurrer the plain meaning of an attached contract controls unless (1) the plaintiff alleges the existence of "specified parol evidence" contrary to that meaning and (2) the contract is reasonably susceptible of the plaintiff's claimed interpretation. (*Id*. at pp. 1122, 1127-28.) In the present case, the trial court was entitled to credit the plain meaning of the recording contracts and the 1989 Assignment because Stewart failed to allege any "specified parol evidence" giving the documents a reasonable alternative meaning.

Stewart contends that "reissued, remastered, remixed or sampled recordings" are not "prior recordings" within the meaning of the 1989 Assignment. This argument fails because it mischaracterizes the phrase "prior recordings" as used in the 1989 Assignment. The document assigns all rights *resulting from* the prior exploitation of his services as a recording artist, which includes *all* his rights under the 1967 and 1972 recording contracts. Stewart's argument that he assigned only his rights with respect to pre-1989

uses of the master recordings and not his rights with respect to future uses, relies on a faulty premise. Master recordings are not sold to the public. In the words of the 1967 Stewart-Sony contract, their value derives from the right to use them to "manufacture by any method now or hereafter known phonograph records and other reproductions" that are sold to the public." Reissued, remastered, remixed and sampled recordings are such reproductions that Sony has the right, as owner of the master recordings, to create from time to time.[6] Stewart's royalty rights in such newly created products are rights "resulting from the prior exploitation of his skills talents and services . . . as a . . . recording artist" within the plain meaning of the 1989 Assignment.

Stewart also alleges that because the 1989 Assignment does not include the word "irrevocable" he retained the right to revoke it. We disagree, since an unlimited assignment normally transfers title. In any event, the issue is moot because his pleadings established he did not purport to revoke the 1989 Assignment until filing his January 2010 complaint, by which time Sony had stopped paying Even Street.

Finally, we note that Stewart's conclusory allegations that his managers and Even Street lacked his authority and he was unaware of their actions are trumped by his pleadings' factual allegations (*Iverson, Yoakum, Papiano & Hatch v. Berwald* (1999) 76 Cal.App.4th 990, 995.) and exhibits (*Banis Restaurant Design, Inc. v. Serrano*, *supra*, 134 Cal.App.4th at pp. 1044-45.) Stewart alleged he has "always [employed] managers and advisers to handle his personal and financial affairs." In 1989, he retained Goldstein, Topley and attorney Stone, through Even Street, "to provide financial advice . . . and to act on [his] behalf . . . ; [and to] manage and take care of all his personal and professional financial affairs . . . ." Once they became his managers, he relied on them to "deal with" the royalty distribution companies. He also gave Even Street and his managers his "all-

---

[6]     Thus, the 2002 Sony Agreement defines "Masters" as the master recordings created under the "Agreements", which, in turn, is defined to include the June 7, 1967 and September 15, 1972 recording Contracts. The 2002 Agreement also defines the "Best of Album," "Box Set," "Essentials Album" and the "Remix Album" as reproductions of the Masters , and the " Samples" are "excerpts of Masters."

encompassing, irrevocable and virtually unlimited power of attorney . . ." to act on his behalf. He confirmed that power by attaching the 1989 Employment Agreement to his pleadings. And, despite the Employment Agreement's stated five year term, Stewart and the Goldstein Group continued to operate under it for 20 years until Stewart terminated it in 2009. Thus, Even Street and the Goldstein Group had authority to deal with the royalty companies as Stewart's agents. Further, Stewart "is deemed to have knowledge of" the conduct of his managers when they act on his behalf, notwithstanding allegations they withheld information from him. (Civ. Code § 2332; *O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 288 (*O'Riordan*); *Columbia Pictures Corporation v. DeToth* (1948) 87 Cal.App.2d 620, 630.) Accordingly, we properly disregard Stewart's conclusory allegations that Even Street and his managers lacked authority to act on his behalf and that he was unaware of their actions.

We conclude the trial court properly rejected Stewart's standing arguments based on the plain meaning of the 1989 Assignment and Stewart's own allegations. Because Stewart assigned to Even Street any and all royalty and other rights derived from Sony's master recordings, Stewart lacks standing to sue Sony over those rights. Once rights are assigned, the assignee "stands in the shoes of the assignor," and "the assignor lacks standing to sue on the claim." (See Civ. Code § 1458; *Johnson*, supra, 111 Cal.App.4th at p. 1096.)[7]

### 3. Stewart lacks standing to sue Warner

Stewart sued Warner for conversion, accounting and declaratory relief. The claims are grounded on the allegation that Warner wrongfully paid Stewart's royalties to

---

[7] Stewart's conversion and negligence claims against Sony are also premised on the contention that the 1989 Assignment did not encompass all of Stewart's rights as to Sony royalties. Since we have concluded that premise is faulty, those claims would fail on the merits even if Stewart had standing to sue. The derivative claims for accounting and declaratory relief would properly be dismissed along with the underlying substantive claims.

Even Street. As noted above, the 1989 Assignment included the Warner royalties. The fourth amended complaint specifically alleges that Warner received the 1989 Assignment and complied with it in distributing the royalties to Even Street.

The trial court ruled on the Warner demurrer in the same breath as its Sony ruling, concluding that the facially valid 1989 Assignment was properly relied on by Warner, which had no notice of any contention it was invalid, or that Stewart objected to the way the royalties were being paid. Again, we agree with the trial court's conclusion.

For the reasons discussed above as to defendant Sony, we conclude Stewart has no standing to bring suit against Warner. The 1989 Assignment divested Stewart of his individual right to the Warner royalties, and of any right to sue for them. (*Johnson, supra*, 111 Cal.App.4th at p. 1096.)

### 4. Assuming standing, Stewart's claims against Warner were properly dismissed

Warner contends the 1989 Assignment negates the "wrongful act" element of the tort of conversion. We agree.

The elements of conversion are: (1) plaintiff's ownership or right to possession of the property; (2) defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066 (*Burlesci*); see *McKell*, *supra*, 142 Cal.App.4th at p. 1491 [conversion requires "defendant's wrongful act toward or disposition of the property, interfering with plaintiff's possession . . ."]*; Gardena Valley Airport, Inc. v. All American Sports Enterprises, Inc.* (1964) 230 Cal.App.2d 478, 481-482 [affirming dismissal of conversion claim where there was no "wrongful conversion" of the subject property].) Moreover, "[t]he law is well settled that there can be no conversion where an owner either expressly or impliedly assents to or ratifies the taking, use or disposition of his property." (*Farrington v. A. Teichert & Son, Inc.* (1943) 59 Cal.App.2d 468, 474; see also *Reno v. A.L. Boyden Co.* (1931) 115 Cal.App. 697, 701 ["[Defendant] Fassel having sold with plaintiff's consent, there could be no conversion. . . ."].)

As the trial court correctly pointed out, "the royalty companies were simply doing what they were instructed to do for years upon years." Warner did not act wrongfully in this matter. It paid and accounted for royalties exactly as instructed by Stewart in a signed, notarized writing. As noted above, the complaint acknowledges Warner received and relied on the 1989 Assignment. The document, which we quoted in full above, clearly and unambiguously transfers the Warner royalty rights to Even Street, and Warner was never given notice of any dispute as to its validity. Indeed, as noted above, Stewart's own pleadings establish that the Goldstein Group acted as his agents in dealing with the royalty companies. Thus, even assuming Stewart has standing to sue Warner, the trial court correctly sustained the demurrer as to the conversion cause of action, as well as the derivative actions seeking accounting and declaratory relief.[8]

## B. Roberts' Separate Claims

Plaintiff Roberts sued BMI for conversion, breach of written agreement and declaratory relief, Roberts alleges he was entitled to over $3,000,000 of BMI royalties which were paid to Goldstein-Majoken and former defendant Bank from 1996 to 2009.

The trial court, immediately after finding Stewart had no standing to sue the royalty companies, stated: "As to Mr. Roberts, he is in a slightly different situation, but I also think the whole argument, really, rises and falls on this [sic] sending royalties to Majoken. Inc." The court then noted BMI was in literal compliance with its obligation to pay Majoken, Inc., although unaware that a second Majoken entity existed at the address to which the royalties were being mailed. The court noted Roberts never contacted BMI with any concerns before 2010. The court stated, "It seems to the court that there is just not a breach of contract claim there as to Mr. Roberts versus BMI." The court also

---

[8]     Having affirmed the trial court's ruling as to *Stewart v. Warner* on two different grounds, we need not reach the other issues debated by the parties, including the statute of limitations, whether the royalty obligation constituted a bailment, and whether plaintiffs alleged a sufficiently identifiable sum to satisfy the "property" element of the tort of conversion.

questioned whether, under New York law, Roberts had succeeded to the assets of Roberts-Majoken when it dissolved. The court added, "So I think Mr. Roberts also has a standing problem up until the time he sends out the notice to change where these things are directed to. I think the royalty companies . . . shouldn't be here. They were doing what they were told to do either by Sylvester Stewart or Mr. Roberts or their agents."

## 1. Roberts has standing to sue BMI

We disagree with the trial court's conclusion that Roberts lacks standing to sue BMI.

There is no dispute that, in 1976, Stewart "unconditionally, irrevocably and absolutely" assigned all his BMI royalty rights to "Roberts and/or Ken Roberts Enterprises . . . and/or his . . . designee, as you may hereafter be directed in writing by Ken Roberts." BMI contends that Roberts lost those rights in the 1979 Modification. The latter document substituted Roberts-Majoken for Ken Roberts Enterprises as Roberts' designated recipient of the royalty payments. We disagree with BMI's argument that the 1979 Modification was an assignment to Roberts-Majoken. The 1979 Modification on its face is not an assignment and does not transfer Roberts' individual rights in the BMI royalties. Rather, under the 1979 Modification, Roberts merely exercised his right to direct payment of the BMI royalties to Roberts-Majoken, "as successor in interest to Ken Roberts Enterprises."

BMI cites to New York Business Corporations Code sections 1006 and 1111 in support of its contention that Roberts does not have standing to bring an action against BMI. Those sections state that the assets do not automatically transfer to the directors of a defunct corporation. However, Roberts was not only Roberts-Majoken's sole director, he was its only shareholder and officer. "When a corporation dissolves, the rights of that corporation transfer to the shareholders upon dissolution of that corporation." (*Gilbert v. Indiana*, 2011 U.S. Dist. LEXIS 16675 *8 (S.D.N.Y. Feb. 16, 2011); see also *Wells v.*

*Ronning* (N.Y. App. Div. 2000) 269 A.D.2d 690, 692 [applying New York Law to determine that "upon dissolution of the corporation, after the payment of or provision for all liabilities, the remaining assets may be distributed to the shareholders," citing N.Y. Business Corporations Law, § 1005].) In *Gilbert*, the plaintiff had assigned certain rights to his wholly owned corporation, which was later dissolved. The court found the result of the dissolution was reversion of the assigned rights to its sole shareholder, the plaintiff. (*Gilbert v. Indiana, supra*, at pp. *8-9.)

We also disagree with BMI's contention that, because earlier versions of the complaint acknowledged a side agreement between the plaintiffs that the assigned royalties would not exceed the amount of Roberts' loans to Stewart, and further acknowledged that the loans "have been repaid," Roberts has no basis for asserting damages. BMI correctly notes that a plaintiff may not resurrect a cause of action by the unexplained omission of facts which made a previous complaint defective. (*Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 946.) Here, however, mere allegations in all versions of the complaint are trumped by relevant documents attached to it. As noted above, the 1976 Assignment from Stewart to Roberts was unconditional, irrevocable and absolute. If liability is established, damages, if any, will flow to Roberts. The issue of whether Roberts *actually* suffered monetary harm is a factual dispute best resolved at trial.

Because Roberts at all times retained his individual rights to the BMI royalties, the trial court erred in concluding Roberts has no standing to sue BMI. We turn to the merits of Roberts' causes of action, which the trial court did not fully address after ruling that Roberts lacked standing to sue BMI.

2. Roberts' sufficiently pled breach of contract and declaratory relief claims against BMI, as limited by the statute of limitations

The essential elements of a breach of contract claim are "(1) the contract, (2) plaintiffs performance or excuse for nonperformance, (3) defendant's breach and (4)

resulting damages to Plaintiff." (*Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.* (2004) 116 Cal.App.4th 1375, 1391, fn 6 (*Armstrong*).) The trial court found Roberts' complaint against BMI lacked a sufficient claim of breach because it acknowledged BMI at all times paid an entity called "Majoken Inc." as it had been directed to do in the 1979 Modification document signed by both Roberts and Stewart. However, that is neither the beginning nor the end of the story. The 1976 Assignment notified BMI that Roberts, and only Roberts, had unconditional control of the BMI royalties, including the right to designate a new recipient entity by written notice. BMI received such written notice from Roberts (and Stewart) when it received and signed off on the 1979 Modification. However, when Stewart's manager, attorney Stone, notified BMI of a change of address for "Majoken Inc." in 1996, BMI had a contractual duty to insist on written instructions from Roberts. Its alleged failure to do so was properly pled as a breach of contract because the direct consequence was payment of the royalties to Goldstein-Majoken rather than Roberts-Majoken. The trial court erred in concluding otherwise.

We also reject BMI's contention that no contract existed between BMI and Roberts. As the unconditional assignee of Stewart's rights, Roberts was owed the same contractual duty which BMI owed Stewart under their original agreement. BMI had notice of the assignment by virtue of its participation in the 1976 Assignment and the 1979 Modification. (*Johnson, supra*, 111 Cal.App.4th at p. 1096.)

BMI contends that Roberts' breach of contract cause of action is barred by the applicable four-year statute of limitations. (See Code Civ. Proc. § 337.) BMI asserts the alleged breach occurred nearly two decades ago, when BMI complied with the notice of change of address that it received from attorney Stone, Stewart's then-manager and attorney. BMI asserts that any claim accrued at that time and is long since time-barred, relying primarily on *Armstrong*, *supra*, 116 Cal.App.4th 1375, along with federal District Court authority. We disagree.[9] As noted in *Armstrong*, "The context of continuing - that is, periodic - accrual for periodic breach is to be distinguished from that of a single

---

[9]     We have reviewed the cited federal cases and find them distinguishable.

breach or other wrong which has continuing impact." (*Armstrong, supra*, at p. 1389; see also *Aryeh v. Canon Business Solutions, Inc*. (2013) 55 Cal.4th 1185, 1197-1198 (*Aryeh*).) *Armstrong* involved breach of an obligation to make monthly payments based on oil and gas production revenue. The court found that each monthly obligation was severable for statute of limitations purposes. (*Id.* at pp. 1388-1396.) Here, the essence of the breach was repeated each time BMI sent a royalty check to an address not authorized by Roberts. We find BMI's periodic payment duties severable, as were the duties in *Armstrong*. (*Aryeh, supra*, 55 Cal.4th at pp. 1198-1201 [monthly Unfair Competition Law violations in context of copier rental contract]; *Wells Fargo Bank v. Bank of America* (1995) 32 Cal.App.4th 424, 439, fn. 7 [monthly rental agreement]; *White v. Moriarty* (1993) 15 Cal.App.4th 1290, 1299 [promissory note]; *Conway v. Bughouse, Inc.* (1980) 105 Cal.App.3d 194, 200 [buy-sell agreement with monthly payments for life].)

We note that any other result would be impractical, since no ascertainable damages would have existed based only on BMI's acceptance of the change of address notice. BMI's position would also be extremely unfair to Roberts, assuming he can make good on his allegation that he was completely unaware of the change of address notice and the payment of royalties to another entity until 2009. Accordingly, Roberts' breach of contract cause of action is not time-barred, but, as he concedes, he may only seek to recover payments dating back four years from the filing of the action against BMI. (Code Civ. Proc. § 337.)

As for declaratory relief, it derives its force from the affirmative claim for breach of contract, and properly remains in the case. Subject to the four-year statute of limitations, Roberts is entitled to a determination of his rights under the BMI-Stewart Affiliation Agreement, the 1976 Assignment and the 1979 Modification.

3. The trial court properly sustained BMI's demurrer to Roberts' conversion claim

As noted above, the elements of conversion are: (1) plaintiff's ownership or right to possession of the property; (2) defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. (*Burlesci,* supra, 68 Cal.App.4th at p. 1066; see

*McKell*, *supra*, 142 Cal.App.4th at p. 1491 [conversion requires "defendant's wrongful act toward or disposition of the property, interfering with plaintiff's possession . . ."].)  In the present case, in addition to finding Roberts had no standing, the trial court expressed doubt that royalty payments can be the subject of conversion.  The trial court also impliedly found no wrongful act, given BMI's undisputed good faith reliance on the notice of address change for Majoken, Inc.  The parties brief these and several other issues related to the conversion claim, including the statute of limitations. We need not reach all of them, because the following are each dispositive.

First, Roberts has no ownership interest in Stewart's BMI royalties which could be converted, despite the 1976 Assignment.  Under the terms of the BMI Affiliation Agreement, neither Stewart nor his assignee owns the monies BMI collects from the licensing of Stewart's performance rights.  As expressly provided in the BMI Affiliation Agreement, "You [Stewart] acknowledge that the rights obtained by you pursuant to this agreement constitute rights to payment of money and that during the period we shall hold absolute title to the performing rights granted to us hereunder."  As a BMI affiliate, Stewart retained, and later assigned to Roberts, only a contractual right to such payments, the breach of which does not support a conversion claim.  (See *Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 452 [" . . . a mere contractual right of payment, without more, will not suffice" to plead conversion]; see also *Cusano v. Klein* (C.D. Cal. 2003) 280 F.Supp.2d 1035, 1043 [summary judgment upheld on conversion claim predicated on breach of royalty agreement]; see also *Rodgers v. Roulette Records, Inc.* (S.D.N.Y. 1988) 677 F.Supp. 731, 736-737 ["Defendants never held property belonging to plaintiff since they only held the proceeds of sales of their own property, the recordings, a part of which they were contractually obligated to pass onto plaintiff in the form of royalties.  [ . . . ] When royalties are due pursuant to a contractual relationship, whether express or implied, a plaintiff cannot recover on a theory of conversion without establishing more." (Citations omitted)].)

Second, "a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from the principles of tort law."  (*Erlich v. Menezes*

(1999) 21 Cal.4th 543, 551(*Erlich*); see also *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 516.) Absent such an independent violation, the "wrongful act" element of the tort of conversion is missing. (*Erlich, supra*, at p. 551.) Despite Roberts' claim that BMI was a bailee and a fiduciary, we agree with BMI's contention that no such independent violation is adequately alleged in the present case.

Roberts' attempt to characterize the agreement between BMI and Stewart as a bailment is not persuasive. "A bailment (called *deposit* in the Civil Code) is the deposit of personal property with another, usually for a particular purpose, under an express or implied contract." (13 Witkin, Summary of California Law (10th ed. 2005) Personal Property, § 156, p. 168.) Bailments generally involve the storage of personal property for hire, as with warehouses, parking lots and banks. None of the cases cited by Roberts stands for the proposition that a licensing agreement creates a bailment, and most of the cases involve items of tangible rather than intangible property. (See e.g. *Byer v. Canadian Bank of Commerce* (1937) 8 Cal.2d 297, 298 [bonds]; *Gebert v. Yank* (1985) 172 Cal.App.3d 544, 547 [two thoroughbred horses].)

The cases cited by Roberts involving the alleged conversion of money are factually inapposite. In *McKell v.Washington Mutual, Inc*., *supra*, 142 Cal.App.4th at p. 1490, plaintiff was held to have failed to plead breach of a bailment agreement and conversion where it alleged that a bank had wrongfully overcharged and refused to refund fees paid for underwriting, tax services and wire transfer services. In explaining its ruling, the *McKell* court noted that plaintiff had failed to cite any authority to support the proposition that a cause of action for conversion can be based on overcharges. (*Ibid*.) *Powell v. Bank of America Nat'l Trust & Sav. Asso.* (1942) 53 Cal.App.2d 458, 463 is also distinguishable. In *Powell*, an owner of sacks of barley deposited them in a warehouse, receiving receipts which he delivered to a bank with the instructions as to disbursement of the funds. In violation of those instructions, the bank sold the property and used the proceeds to satisfy its own judgment against the owner. Notably, *Powell* involves facts that are not present here: a corpus of property delivered and entrusted to a bank, the sale of that property by the bank, and the bank's self-dealing in using the sale

proceeds to satisfy its own judgment against the owner in violation of the instructions of the owner. In addition, the present case involves no allegation of money held in trust or reserve accounts as occurred in *McKell*, supra, 142 Cal.App.4th at p. 1490 and *Clifford v. Concord Music Group, Inc*. (N.D. Cal. 2012, No. C-11-2519 EMC) 2012 U.S. Dist. LEXIS 14084.

Further, in the Fourth Amended Complaint Roberts has not alleged a bailment and he may not turn a licensing agreement into a bailment by saying so in a brief. A license is a "mere waiver of the right to sue" the licensee for infringement. (*DeForest Radio Telephone Co. v. United States* (1927) 273 U.S. 236, 242.) Roberts has not shown authority that a licensing agreement can be the subject of a bailment. Further, he has not and cannot allege a *breach* of bailment by BMI. There is no accusation here that BMI did anything improper with its contractual licensing authority, as opposed to the royalties derived from that authority.

Roberts' contends BMI breached a fiduciary relationship which was established by the provision in the BMI Affiliation Agreement granting BMI a power of attorney to enforce Stewart's royalty rights. Again, we are not persuaded. The power of attorney provision was limited in scope to enforcing and protecting the very rights granted to BMI in the contract. It created no additional duty on the part of BMI that can be characterized as fiduciary. (See *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 27; *Cusano v. Klein*, *supra,* 280 F.Supp.2d at pp. 1040-1041 [limited power of attorney in royalty contract does not establish fiduciary relationship for all purposes]; compare *Tran v. Farmers Group, Inc.* (2002) 104 Cal.App.4th 1202, 1206 [limited fiduciary duty created by power of attorney in insurance context].)

Thus, had the trial court reached the merits of Roberts' conversion claim against BMI, it would have been obligated to sustain the demurrer.

## VI. DISPOSITION

The trial court shall vacate its order sustaining defendant Broadcast Music, Inc.'s demurrer to plaintiff Ken Roberts' causes of action for breach of contract and declaratory relief.  In all other respects the rulings and orders of the trial court are affirmed. Defendants Sony, BMI and Warner shall recover their costs on appeal from plaintiff Sylvester Stewart.  No costs are awarded as between defendants and plaintiff Roberts, and as between former defendant First California Bank and plaintiffs.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

O'NEILL, J.[*]

We concur:

TURNER, P.J.

ARMSTRONG, J.

---

[*]    Judge of the Ventura County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.